## PERKINS, Secretary of Labor, v. ENDICOTT JOHNSON CORPORATION et al.

District Court, N. D. New York.
Aug. 19, 1941.

Ralph L. Emmons, U. S. Atty., of Binghamton, N. Y. (David Lloyd Kreeger, Sp. Asst. to Atty. Gen., and Clifford P. Grant, Atty., Division of Public Contracts, Department of Labor, of Washington, D. C., of counsel), for plaintiff.

Howard A. Swartwood, of Endicott, N. Y. (William H. Pritchard, Jr., of Endicott, N. Y., of counsel), for defendants.

BRYANT, District Judge.

A hearing has been had in conformity with my decision. D.C., 37 F.Supp. 604. The present issue is whether or not an order, directing defendants to obey an administrative subpœna duces tecum, should issue.

My decision (supra) sets forth the facts leading up to the controversy in sufficient detail to obviate the necessity, except in a few instances, of a re-statement.

The Endicott-Johnson Corporation is an integrated industry. It is plaintiff's contention that all of the corporation's factories and departments, regardless of where located and how operated, wherein materials, which went into the articles manufactured, were made or in any manner worked upon, are within the provisions of the so-called Walsh-Healey Act, 41 U.S.C.A. §§ 35–45, and that the pay rolls and records of these varied factories and departments are subject to inspection by representatives of the Division of Public Contracts of the Department of Labor.

Plaintiff further contends that this Court is without authority to determine whether or not the request for an Order compelling obedience to an administrative subpœna is well grounded. She says that it is her right to determine whether or not the corporation's varied and numerous factories and departments are covered by the Act. I am not aware that I have held otherwise. Had the Secretary of Labor made such a finding, this controversy would not be here. Her complaint contains no allegation of such a finding. In fact, it states the opposite. A considerable portion of her brief is directed to the proposition that the allegation "the Secretary of Labor has reason to believe" deprives the Court of all discretionary power. Like an automatom, it must make the order requested. The last two contentions are not here germane. I ruled upon them in my opinion (supra).

The defendants maintain, and have consistently maintained, that the stipulations in the contract, required by Sec. 1 of the Walsh-Healey Act, apply only to the corporation's footwear factories. Generally, they maintain: (1) That the tanning of leather, the manufacture of rubber soles and heels, cut soles, counters and cartons are all separate, distinct and unrelated industries from the manufacture of footwear; that, being separate and distinct industries, the stipulations, included in a contract limited to the manufacture of footwear only, do not apply. (2) That Endicott-Johnson Corporation, in the tanning of leather and in the manufacture of the articles named, was not a manufacturer subject to the stipulations of the contract because its tanneries, rubber mills, etc., were not engaged in producing upon the premises any of the articles of the general character described in the footwear specifications. Art. 101 of Regulations covering the Act.

I shall consider defendants' last contention first. The Act provides that the contract must contain a stipulation that the contractor is either a manufacturer of or a regular dealer in, the articles to be manufactured or used in the performance of the contract. Walsh-Healey Act. Sec. 1, 41 U.S.C.A. § 35. Subd. (a) and (b) of Art. 101 of the Regulations of 1937, covering the Act, simply give the Department's definitions of manufacturer and dealer. They read:

"(a) A manufacturer is a person who owns, operates, or maintains a factory or establishment that produces on the premises the materials, supplies, articles, or equipment required under the contract and of the general character described by the specifications.

"(b) A regular dealer is a person who owns, operates, or maintains a store, warehouse, or other establishment in which the materials, supplies, articles, or equipment of the general character described by the specifications and required under the contract are bought, kept in stock, and sold to the public in the usual course of business."

■ These definitions are for the purpose of determining who may receive contracts. Their purpose is spent when the contract is awarded. Any limitations therein stated cannot be construed as a limitation on the construction to be placed upon subd. (b) and (c) of Sec. 1 of the Act, which set forth the stipulations in controversy here.

In accordance with the provisions of Sec. 1 of the Act, the stipulations contained in subdivisions (b) and (c) thereof were embodied in the contracts. These stipulations are that all persons "employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in performance of the contract" will be paid certain minimum wages and that they will not be permitted to work over forty hours per week, except as they are paid for overtime.

My attention has not been called to any authorities bearing directly upon the application of the stipulations in connection with integrated industries. Plaintiff has cited large numbers of cases, but the facts upon which they are based make them inap-

plicable to the issue here. The list is so lengthy that separate distinguishment is impossible.

Plaintiff, by permission, submitted with her brief several rulings of the Department of Labor made by letter. She, also, by permission, included in her brief oral rulings on coverage of employees in integrated industries. The above, with the Rulings and Interpretations issued by the Department on July 6, 1937, and September 29, 1939, have been carefully studied. I believe I am safe in saying that I am in accord with the rulings that have been brought to my attention. As I interpret the submitted rulings, the Act covers those employees, regardless of location of factories or departments, whose tasks are a part of and normally associated with the production of the contracted articles. Perhaps it would be clearer to state that the Act covers in all factories where the production is a part of an uninterrupted process of manufacture. Negatively speaking, the Department does not claim coverage over manufacture of materials taken from general stock for use in performance of the contract. To make such a claim would give the statute a retroactive application. The Act does not cover employees working on parts where, until after manufacture, it is impossible to determine whether the parts are suitable for use under the contract. Such employees are manufacturing for general stock as distinguished from working on contracts. This is so even though some of the parts, after manufacture, are selected as suitable material for manufacture under the contracts. The above seem to be the interpretations placed upon the Act by a letter of Administrator Walling, dated April 26, 1939, and by letters of Acting Administrator Reilly, dated January 9, 1937, and December 30, 1936. The other letters submitted do not apply to the facts in this case.

At the time of the making of the contract, and during the period of performance, there were no published rules relating to coverage of employees in integrated industries. After the beginning of this dispute Sec. 2 of the Rules of September 29, 1939, were published. This section seems to be a codifying of the interpretations stated above. The gist of the section is that "the Act is applicable to those departments which are engaged in the manufacture of the materials or supplies to be so incorporated into or used in the manufacture or processing of the ultimate product to be delivered to the Government as well as to the employees engaged in the manufacture or processing of that ultimate product". This section neither adds nor subtracts from the interpretations heretofore stated. To hold otherwise would be the placing of a construction on the Act that could easily lead into the realm of impossibility. It, also, would be a reversal of the very rulings which the Department has submitted for the Court's guidance.

It now only remains to apply the Department's rulings, with which I agree, to the present facts.

The leather, or most of it, used in the manufacture of the boots and shoes, called for by the contracts, was tanned in the corporation's tanneries located at considerable distances from the factories designated for manufacture.

The so-called Upper Leather Tannery and Calf Skin Tannery make chrome leather for use in the manufacture of the upper part of shoes and boots. According to the testimony the hides are washed, cleaned and dehaired; then they go through the "pickling operation" and then through the solution which is the actual chrome tanning. I cannot see that anything will be gained by describing the operations used in these various steps. When the hides are taken from the chrome tanning they are known as "Blue" because of the color. The process to this stage takes about fifteen days. Up to this stage all hides are handled in the same manner and it is impossible to determine the use to which any can be put. In the Blue Department the different kinds of leather, which have been tanned, are tentatively sorted and marked by punch holes in the back of the hides. When the corporation has Government contracts, the sorter punches the best hides as possibly suitable for Government use. The hides then go through the splitting machines, the dyeing room, the stacking machines and the buffing operations. In the buffing room, the packs are again examined and regraded. The leather then goes through the finishing room and from there to the shipping department where it is definitely sorted and graded.

Regarding the marking in the so-called Blue Department in the Calf Skin Tannery, there is some dispute, but not a material

one. One of plaintiff's witnesses, who visited the tannery some time in November, 1939, testified that some inspector was sorting hides for use under the contracts and stamping same with an ink stamp bearing the mark "Gov't" or "G.C.". The testimony satisfies me that the witness was mistaken. Evidently the witness mistook the sorter for an inspector. To use an ink stamp at this stage of the tanning process would be a futile act. However, as stated before, the dispute is immaterial because the witness agrees with defendants that it "is no selection that is ultimately used."

The various steps taken in the hides' travel through the two tanneries, briefly outlined above, lead me to the conclusion that in reality the leather used under the contracts was taken from stock. The hides were not tanned for any particular use. Selections were made in the stock room. True, there were tentative selections in the Blue and Buffing Departments. At best these were cursory piling of different grades. The different packs or grades travelling from the Blue Department through the buffing operation do not take separate routes. The different packs go through together so that segregation of employees to different grades would be impracticable. The suitability of the hides for Government use could not be determined until the tanning operations were completed. This is borne out by the fact that only about fifteen percent of the hides were found suitable for the contracts.

The sole leather is vegetable tanned. It takes about sixty-five days to complete the tanning operation. No tentative selections or gradings are made. Until the leather reaches the stock room, and is graded for kind, quality and thickness, it is impossible to determine the kind of shoes for which it is suitable. It must, therefore, be said that all operations are for the making of stock. During the period in question approximately five percent of the stock was used in Government orders. The stock is disposed of upon orders from factories calling for sole leather of such quality, thickness, etc.

In the performance of the contracts in question, the various designated factories called for sole leather of certain thicknesses. This was sent from the stock room of the sole leather tannery to the sole cutting department. There it was cut into soles and graded for size, surface, quality and thickness. A Government Inspector then re-sorted them. From the pile of manufactured soles he selected the ones to be used in the contracts and placed a Government stamp on each piece. These were shipped to the designated factory. These represented about 5 percent of the soles cut during the period.

I find no testimony bearing directly on the manufacture of counters. From the record, I gather that their manufacture, grading, inspection, and selection followed the same course last above stated.

The rubber heels and soles used in the contract could not be selected until they had been taken from the molds and sorted and graded as to defects, sizes, etc.

I can place no other construction on the operations than that of manufacture for stock. I am unable to differentiate between a man going to a stock pile and selecting certain articles and a man standing at the tail end of an operation and making a selection of the same articles before they are piled. To me both operations mean selection from stock.

■ The carton factory makes the cartons for all factories manufacturing shoes, boots, arctics, etc. The evidence does not show the method of manufacture. From the record, I infer the cartons are fashioned to size. Presumably the factory makes and keeps on hand sufficient quantities of different sized cartons to meet requisitions from the various factories. If such be the fact, then the cartons are made for stock. Regardless of that, I cannot say that paste board boxes are "materials required" under contracts calling for the manufacture of shoes and overshoes, nor that the makers thereof are "workers on tasks normally associated with the manufacture of shoes". This last applies as well to the operations of the tanneries and rubber mill. These, as well as the carton factory, are classified in the yearly Census of Manufacturers as separate, distinct and unrelated industries from the shoe manufacturing industry. Under the provisions of the National Industrial Recovery Act, 48 Stat. 195; these industries and the shoe manufacturing industry had separate and distinct Codes of Fair Competition. The Administrator of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, and the Secretary of Labor have recognized the distinction in the fixing of wage codes. Being unrelated industries, they should not come under the provisions of the Act unless the proof

clearly shows manufacture of materials for use in the contracts as distinguished from manufacture for stock.

In this proceeding it is not my province to make a finding that the employees of the factories in question are or are not covered by the stipulations of the Walsh-Healey Act. That is a prerogative belonging to the Secretary of Labor. If the employees are covered then the Secretary has a right to examine the time and pay roll records of those factories, otherwise not. Without such a finding having been made, this Court was asked to compel the corporation to produce their records for inspection. The court demanded proof showing good reason to believe that the records were subject to inspection. Securities and Exchange Commission v. Tung Corporation, D.C., 32 F.Supp. 371. Without such proof this Court, through the issuance of such an order, would be aiding the Labor Department in carrying out an "extra-legal inquisition". National Labor Relations Board v. New England Transportation Co., D.C., 14 F. Supp. 497, 498.

The facts do not satisfy me that the records sought are subject to inspection. I therefore, deny plaintiff's application.

An order may be presented on notice.