ENDICOTT JOHNSON CORP. ET AL. *v.* PERKINS, SECRETARY OF LABOR.

No. 142. Argued November 20, 1942.—Decided January 11, 1943.

*Mr. Howard A. Swartwood,* with whom *Messrs. William H. Pritchard, Edward H. Green,* and *John C. Bruton* were on the brief, for petitioners.

*Mr. Paul Freund,* with whom *Solicitor General Fahy, Assistant Attorney General Shea,* and *Messrs. Sidney J. Kaplan* and *Irving J. Levy* were on the brief, for respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

This case concerns the validity of a subpoena issued by the Secretary of Labor in administrative proceedings against the petitioner under the Walsh-Healey Public Con-

tracts Act.[1]  The petitioner successfully resisted the Secretary's petition for enforcement in the District Court,[2] whose judgment was in turn reversed by the Circuit Court of Appeals for the Second Circuit.[3]  We granted certiorari because of the importance of the questions in the enforcement of the Act, and because of probable conflict with a holding of the Circuit Court of Appeals for the Sixth Circuit.[4]

The Walsh-Healey Act requires that contracts with the Government for the "manufacture or furnishing of materials, supplies, articles, and equipment in any amount exceeding $10,000" shall represent and stipulate, *inter alia,* for the payment of "not less than the minimum wages as determined by the Secretary of Labor" (§ 1 (b)), and that "no person employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight hours in any one day or in excess of forty hours in any one week" (§ 1 (c)); but provides that the Secretary may allow exemptions from the minimum wage provisions, and permit increases in the stipulated maximum hours on payment of wages at "not less than one and one-half times the basic hourly rate received by any employee affected."   (§ 6.)

The Act provides for liquidated damages for violations of required stipulations in the contract (§ 2); and, further, that "unless the Secretary of Labor otherwise recommends" no government contract shall be awarded to the

---

[1] 49 Stat. 2036; 41 U. S. C. § 35–45.

The proceedings were instituted against both petitioners, the Endicott Johnson Corporation and its secretary, and both participated in the subsequent litigation.  For convenience we refer to both as "the petitioner."

[2] 37 F. Supp. 604 and 40 F. Supp. 254.

[3] 128 F. 2d 208.

[4] *General Tobacco & Grocery Co.* v. *Fleming,* 125 F. 2d 596.

firm or subsidiaries of the firm which he finds to have defaulted in its obligation under the Act "until three years have elapsed from the date the Secretary of Labor determines such breach to have occurred." (§ 3.)

The Secretary is directed "to administer the provisions of this Act" and empowered to "make investigations and findings as herein provided, and prosecute any inquiry necessary to his functions." (§ 4.) And that he may the better and the more fairly discharge his functions, he is authorized to hold hearings "on complaint of a breach or violation of any representation or stipulation" and "to issue orders requiring the attendance and testimony of witnesses and the production of evidence under oath. . . . In case of contumacy, failure, or refusal of any person to obey such an order," the District Court of the United States "shall have jurisdiction to issue to such person an order requiring such person to appear before him or representative designated by him, to produce evidence if, as, and when so ordered, and to give testimony relating to the matter under investigation or in question; and any failure to obey such order of the court may be punished by said court as a contempt thereof." The Secretary is directed to make "findings of fact after notice and hearing, which findings shall be conclusive upon all agencies of the United States, and if supported by the preponderance of the evidence, shall be conclusive in any court of the United States; and the Secretary of Labor . . . shall have the power, and is hereby authorized, to make such decisions, based upon findings of fact, as are deemed to be necessary to enforce the provisions of this Act." (§ 5.)

Pursuant to her authority under the Act, the Secretary in 1937 defined by rulings the coverage of the Act. She provided, *inter alia*, that "employees engaged in or connected with the manufacture, fabrication, assembling, handling, supervision, or shipment of materials, supplies, articles, or equipment used in the performance of the con-

tract" might be employed overtime, at "one and one-half times the basic hourly rate or piece rate received by the employee." [5] Stipulations as to minimum wages were made to "apply only to purchases or contracts relating to such industries as have been the subject of a determination by the Secretary of Labor." [6] Thereafter, and on December 21, 1937, she made a determination of minimum wages to be paid employees "engaged in the performance of contracts . . . for the manufacture or supply of men's welt shoes." On September 29, 1939, and after the completion of the contracts involved in this case, the Secretary issued rulings specifically dealing with "integrated establishments." [7]

From the pleadings in the District Court and admitted statements in affidavits filed, there appear the following facts:

Between October 26, 1936, and June 8, 1938, petitioner was awarded several contracts for boots, shoes, gymnasium shoes and arctic overshoes. Each was for an amount in excess of $10,000, and each contract included representations and stipulations in accordance with the Act and the

---

[5] Rulings and Interpretations under the Walsh-Healey Public Contracts Act, No. 1, § 4 (2) (a).

[6] *Ibid.* § 4 (1).

[7] Rulings and Interpretations No. 2, providing in § 1 (2):

"When a contractor to whom a contract subject to the Act is awarded operates an integrated establishment which manufactures or produces materials or supplies that are incorporated into or otherwise used in the manufacture or supply of the materials, supplies, articles, or equipment called for by the contract, the Act is applicable to those departments which are engaged in the manufacture or production of the materials or supplies to be so incorporated into or used in the manufacture or processing of the ultimate product to be delivered to the Government as well as to the employees engaged in the manufacture or processing of that ultimate product. For example: The processing of the leather and rubber for the shoes supplied under Government contracts subject to the Act is within the purview of the Act and Regulations, and compliance therewith is essential."

Secretary's rulings thereunder set out above. Bids for and awards of the contracts designated the places of manufacture, and manufacture elsewhere was forbidden.[8] In the plants so specified, notices required by the contract were posted,[9] and there the petitioner admitted an obligation and apparently intended to comply with the Act and contract. The violations claimed in those plants are minor, if any; petitioner offered to adjust any violation found there and it has willingly furnished complete records and information as to those plants and those employed in them. But there ended, the petitioner claims, both the investigatory power of the Secretary and its obligation to make its records available.

The Secretary did not agree, and instituted an administrative proceeding against petitioner, charging violation

---

[8] The bid stated:

"Bidders must state in space provided below names and locations of the factories where manufacture of the item bid upon will be performed. The performing of any of the work contracted for in any place other than that named in the bid is prohibited unless the same is specifically approved in advance by the Contracting Officer. If more than one place of manufacture is named, the quantity to be manufactured in each place must be given."

A typical statement in response is:

| Names and locations of factories: | Quantities |
|---|---|
| "George F. Tabernacle" Factory (item 1) | 133,524 pairs |
| East side of Washington Street (item 2) | 182,256 pairs |
| (South of corner Susquehanna Street), Binghamton, N. Y., (total items 1 and 2) | 315,780 pairs |

A typical notice of award stated:

For 133,524 pairs Shoes, Service; Special Type "B" with Full Middle sole and Rubber Heel; 182,256 pairs Shoes, Service, Special Type "B," with Corded Rubber Sole and Uncorded Rubber Heel.

To be manufactured at or supplied from Geo. F. Tabernacle, (Name and location of plants) Binghamton, N. Y.

[9] Article 18 (g).

of the stipulations in the contract by virtue of payments by petitioner of less than the minimum wages determined by her on December 21, 1937, for the "manufacture or supply of men's welt shoes," and of failure to make required additional payments for overtime work, in other and physically separate plants owned and operated by the petitioner. In those plants, it manufactured parts such as counters and rubber heels, tanned leather for uppers and soles, and made cartons for packaging shoes for the Government, as well as for its civilian customers. The subpoena in question issued in this proceeding called for records chiefly relating to payrolls in such plants, and as to them the petitioner refused to comply.

To obtain the compliance to the subpoena which petitioner refused, the Secretary had resort to the District Court as provided by § 5, alleging the foregoing facts and that "following an investigation by representatives of the Department of Labor, and it having appeared to the plaintiff upon the basis of such investigation that defendant" had violated these stipulations of the contracts, she commenced such proceeding; and that "plaintiff has reason to believe, and said amended (administrative) complaint alleges, that the persons employed" and alleged to have been underpaid "in its Calfskin Tannery, Upper Leather Tannery, Sole Leather Tannery, Paracord Factory, Sole Cutting Department (Johnson City), Sole Cutting Department (Endicott), Counter Department (Johnson City), and Carton Department (Johnson City) were employed by it in performance of the contracts specified," and that such allegations were denied by the answer in the administrative proceedings.

The Corporation pleaded to the District Court its ownership and management of the plants in question and that the rubber heels and soles, the counters, cartons, and all except a portion of the leather soles "used in the manufacture" of the government footwear, "were manufac-

tured" in its several separate plants or departments. It also set forth in full its answer in the administrative proceeding and reasons why it considered "arbitrary, artificial, unreasonable, discriminatory, and capricious" the ruling of the Secretary that the Act and contract applied to the plants other than those specifically named in the contracts. It denied that the payroll and similar records sought as to such plants were relevant to the determination of any matter confided to the Secretary's determination.

The District Court denied the Secretary's motion on the pleadings and accompanying affidavits for an enforcement order, overruled her contention that it was for her to decide this issue in the administrative proceeding, and set the case down for trial on the question of whether the Act and contracts under the circumstances covered the separate plants.

We think that the admitted facts left no doubt that under the statute determination of that issue was primarily the duty of the Secretary.

The Act directs the Secretary to administer its provisions. It is not an Act of general applicability to industry. It applies only to contractors who voluntarily enter into competition to obtain government business on terms of which they are fairly forewarned by inclusion in the contract. Its purpose is to use the leverage of the Government's immense purchasing power to raise labor standards.

Congress submitted the administration of the Act to the judgment of the Secretary of Labor, not to the judgment of the courts.[10] One of her principal functions is the conclusive determination of questions of fact for the guidance of procurement officers in withholding awards of govern-

---

[10] Cf. *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, and cases there cited.

ment contracts to those she finds to be violators for three years from the date of the breach.

The matter which the Secretary was investigating and was authorized to investigate was an alleged violation of this Act and these contracts. Her scope would include determining what employees these contracts and the Act covered. It would also include whether the payments to them were lower than the scale fixed pursuant to the Act. She could not perform her full statutory duty until she examined underpayments wherever the coverage extended, because underpayment is an indispensable, albeit not the only, element of proof of violation. It is the only basis on which she can compute liquidated damage as she is required to do, and it is necessary to find the date of the last underpayment to fix the beginning of the three-year period of disqualification for further contracts. Thus the payrolls are clearly related to the violation. Indeed, the underpayment is itself the violation under investigation.

Of course another indispensable element of violation is that the underpaid employee be included within the benefits of the Act and contracts. This, too, was a matter under investigation in the administrative proceeding. But because she sought evidence of underpayment before she made a decision on the question of coverage and alleged that she "had reason to believe" the employees in question were covered, the District Court refused to order its production, tried the issue of coverage itself, and decided it against the Secretary. This ruling would require the Secretary, in order to get evidence of violation, either to allege she had decided the issue of coverage before the hearing or to sever the issues for separate hearing and decision. The former would be of dubious propriety, and the latter of doubtful practicality. The Secretary is given no power to investigate mere coverage, as such, or to make findings thereon except as incident to trial of the issue of violation. No doubt she would have discretion to take

up the issues of coverage for separate and earlier trial if she saw fit. Or, in a case such as the one revealed by the pleadings in this one, she might find it advisable to begin by examining the payroll, for if there were no underpayments found, the issue of coverage would be academic. On the admitted facts of the case, the District Court had no authority to control her procedure or to condition enforcement of her subpoenas upon her first reaching and announcing a decision on some of the issues in her administrative proceeding.

Nor was the District Court authorized to decide the question of coverage itself. The evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the Secretary in the discharge of her duties under the Act, and it was the duty of the District Court to order its production for the Secretary's consideration. The Secretary may take the same view of the evidence that the District Court did, or she may not. The consequence of the action of the District Court was to disable the Secretary from rendering a complete decision on the alleged violation as Congress had directed her to do, and that decision was stated by the Act to be conclusive as to matters of fact for purposes of the award of government contracts. Congress sought to have the procurement officers advised by the experience and discretion of the Secretary rather than of the District Court. To perform her function she must draw inferences and make findings from the same conflicting materials that the District Court considered in anticipating and foreclosing her conclusions.

The petitioner has advanced many matters that are entitled to hearing and consideration in its defense against the administrative complaint, but they are not of a kind that can be accepted as a defense against the subpoena.[11]

---

[11] These relate to: the meaning of the contract and the Act as implemented by administrative rulings in existence at the time of the making and performance of the contract; the question of possible retro-

The subpoena power delegated by the statute as here exercised is so clearly within the limits of Congressional authority that it is not necessary to discuss the constitutional questions urged by the petitioner, and on the record before us the cases on which it relies [12] are inapplicable and do not require consideration.

*Affirmed.*

MR. JUSTICE MURPHY, dissenting:

Because of the varied and important responsibilities of a quasi-judicial nature that have been entrusted to administrative agencies in the regulation of our political and economic life, their activities should not be subjected to unwarranted and ill-advised intrusions by the judicial branch of the government. Yet, if they are freed of all restraint upon inquisitorial activities and are allowed uncontrolled discretion in the exercise of the sovereign power of government to invade private affairs through the use of the subpoena, to the extent required or sought in situations like the one before us and other inquiries of much broader scope, under the direction of well-meaning but over-zealous officials they may at times become instruments of intolerable oppression and injustice. This is not to say that the power to enforce their subpoenas should never be entrusted to administrative agencies, but thus far Congress, for unstated reasons, has not seen fit to confer such authority upon any agency which it has

active effect of Rulings and Regulations No. 2, *supra,* note 7; the nature of petitioner's business organization; and practices of procurement, manufacture, storage, consumption and distribution obtaining at petitioner's plants.

[12] *Boyd* v. *United States,* 116 U. S. 616; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447; *Harriman* v. *Interstate Commerce Commission,* 211 U. S. 407; *Ellis* v. *Interstate Commerce Commission,* 237 U. S. 434; *Federal Trade Commission* v. *American Tobacco Co.,* 264 U. S. 298.

created.[1]  So here, while the Secretary of Labor is empowered to administer the Walsh-Healey Act, to "prosecute any inquiry necessary to his functions," and "to issue orders requiring the attendance and the testimony of witnesses and the production of evidence under oath," he alone cannot compel obedience of those orders. "Jurisdiction" so to do is conferred upon the district courts of the United States and it is our immediate task to delineate the proper function of those courts in the exercise of this jurisdiction.[2]  Specifically the question is: What is the duty of the courts when the witness or party claims the proceeding is without authority of law?

---

[1] The disregard of subpoenas issued by some agencies is punishable by fine and imprisonment in a criminal proceeding, but apparently no federal agency has ever been given the power to punish disobedience as a contempt of its authority. (See Final Report of the Attorney General's Committee on Administrative Procedure, Appendix K.) The common method of enforcing subpoenas is to punish disregard of the subpoena as contempt of the issuing body. It has been held in some states that the power to punish for contempt cannot be conferred upon a body of a non-judicial character. See *Langenberg* v. *Decker,* 131 Ind. 471, 31 N. E. 190; *In re Whitcomb,* 120 Mass. 118, 21 Am. Rep. 502. Contra, *In re Hayes,* 200 N. C. 133, 156 S. E. 791. Compare statements in *Interstate Commerce Comm'n* v. *Brimson,* 154 U. S. 447, at 485 and 489.

[2] Section 5 of the Act provides in part: "In case of contumacy, failure, or refusal of any person to obey such an order, any District Court of the United States or of any Territory or possession, or the Supreme Court of the District of Columbia, within the jurisdiction of which the inquiry is carried on, or within the jurisdiction of which said person who is guilty of contumacy, failure, or refusal is found, or resides or transacts business, upon the application by the Secretary of Labor or representative designated by him, shall have jurisdiction to issue to such person an order requiring such person to appear before him or representative designated by him, to produce evidence if, as, and when so ordered, and to give testimony relating to the matter under investigation or in question; and any failure to obey such order of the court may be punished by said court as a contempt thereof; . . ."

Criminal sanctions are not provided.

This Court, in recognition of the drastic nature of the subpoena power and the possibilities of severe mischief inherent in its use, has insisted that it be kept within well-defined channels. Cf. *Boyd* v. *United States,* 116 U. S. 616; *Hale* v. *Henkel,* 201 U. S. 43; *Federal Trade Comm'n* v. *American Tobacco Co.,* 264 U. S. 298; *Cudahy Packing Co.* v. *Holland,* 315 U. S. 357, 363. In conditioning enforcement of the Secretary's administrative subpoenas upon application therefor to a district court, Congress evidently intended to keep the instant subpoena power within limits, and clearly must have meant for the courts to perform more than a routine ministerial function in passing upon such applications. If this were not the case, it would have been much simpler to lodge the power of enforcement directly with the Secretary, or else to make disregard of his subpoenas a misdemeanor. So we have said that "appropriate defense may be made" to such an application for enforcement. *Myers* v. *Bethlehem Corp.,* 303 U. S. 41, 49.

The Government concedes that the district courts are more than mere rubber stamps of the agencies in enforcing administrative subpoenas and lists as examples of appropriate defenses, claims that a privilege of the witness, like that against self-incrimination, would be violated; [3] or that the subpoena is unduly vague or unreasonably oppressive; [4] or that the hearing is not of the kind authorized; [5] or that the subpoena was not issued by the person vested with the power; [6] or that it is plain on the pleadings that the evidence sought is not germane to any lawful subject of inquiry. But the Government insists that the issue

[3] Cf. *Boyd* v. *United States,* 116 U. S. 616.

[4] Cf. *Hale* v. *Henkel,* 201 U. S. 43; *Federal Trade Comm'n* v. *American Tobacco Co.,* 264 U. S. 298.

[5] Cf. *Harriman* v. *Interstate Commerce Comm'n,* 211 U. S. 407; *Ellis* v. *Interstate Commerce Comm'n,* 237 U. S. 434.

[6] Cf. *Cudahy Packing Co.* v. *Holland,* 315 U. S. 357.

of "coverage," i. e., whether the Act extends to plants of petitioner's establishment which manufactured materials used in making complete shoes but not named in the contracts, is not a proper ground for attack in this case. I think it is.

If petitioner is not subject to the Act as to the plants in question, the Secretary has no right to start proceedings or to require the production of records with regard to those plants. In other words, there would be no lawful subject of inquiry, and under present statutes giving the courts jurisdiction to enforce administrative subpoenas, petitioner is entitled to a judicial determination of this issue before its privacy is invaded. Cf. *Interstate Commerce Comm'n* v. *Brimson,* 154 U. S. 447, 479; *Harriman* v. *Interstate Commerce Comm'n,* 211 U. S. 407; *Ellis* v. *Interstate Commerce Comm'n,* 237 U. S. 434; *General Tobacco & Grocery Co.* v. *Fleming,* 125 F. 2d 596.

Of course, the courts should not arrogate to themselves the functions of administrative agencies. It is trite but truthful to say that administrative agencies render valuable and very necessary services in the solution of the complex governmental and economic problems of our time. In the making of investigations, the determination of policy, the collection of evidence, and its current evaluation, preparatory or incidental to administrative action, experience and special training are valuable aids. But after all, as pointed out by Gellhorn, Federal Administrative Proceedings, pp. 27–29, the administrator is only an expert ex-officio.[7] Just as the courts should not usurp

---

[7] "When reference is made to the 'expert administrative agency,' it is surely not intended to mean that the necessary expertness is lodged in the head or heads of the agency or that they, in their own person, possess every *expertise* needed for the informed discharge of the manifold duties imposed upon the modern administrative organization. . . .'. We must look beyond the heads to find the talents which make the agency expert in its assigned tasks. This is a central

the prerogatives of the agencies, neither should the word "administrative" and its companion "expertness" over-awe them into abdicating responsibilities imposed upon them by Congress.

The legal propriety of instituting proceedings is a question which an agency is authorized if not obliged to determine, provisionally at least, before instituting the proceedings. But while the decision may be the agency's in the first place, it is not a decision which it is ordinarily more competent to make than the courts and judges, who (at least in theory) should be more qualified than administrative officers, many of whom are laymen, to determine whether a statute extends to a certain set of facts. If the preliminary determinations by an agency of the scope of its power and jurisdiction are sacrosanct, why did Congress subject their final determination to judicial scrutiny, as it has done in the Walsh-Healey Act with regard, at least, to the enforcement of the wage and hour requirements on behalf of the employees? And if the courts are qualified to pass final judgment on the "quasi-judicial" findings and conclusions of the administrators, which they are ordinarily permitted to do to a greater or lesser extent,[8] they are no less qualified to determine whether the evidence which moved the administrator to enter a formal complaint is sufficient in law to show probable cause that the statute under which the administrator is proceeding covers the case. Without such a showing of probable cause, the district courts ought not to be required as a matter of mere routine to lend their aid to the proceeding by compelling obedience to the subpoena.

---

reality. . . . The administrative agency as now organized is a vehicle for bringing the judgments of numerous specially qualified officials to bear upon a single problem."

[8] The Walsh-Healey Act provides in § 5 that the Secretary's findings of fact shall be conclusive in any court of the United States "if supported by the preponderance of the evidence."

It is to be understood, of course, that if the matter is in doubt and if there is a reasonable legal basis for the charge, the court should not substitute its judgment on the law or the facts for that of the agency. The court's duty is to assist the agency in the performance of its functions and the discharge of its responsibilities, in the absence of a clear and convincing showing that it is proceeding without legal warrant. But it is hardly its duty to assist in the face of such a showing. So, when it becomes necessary for the Secretary in the course of a proceeding under the Walsh-Healey Act to appeal to the district court for the exercise of its jurisdiction over subpoena enforcement, it is within the competence and authority of the court to inquire and satisfy itself whether there is probable legal justification for the proceeding, before it exercises its judicial authority to require a witness or a party to reveal his private affairs or be held in contempt.

Considerations of practical advantage and elementary justice support this conclusion. Such a rule carries out what must have been the statutory intent, and would permit a timely and reasonable measure of judicial control over administrative use of the drastic subpoena power, subject to prompt review if the control were abused to the detriment of the agency. If administrative agencies may be temporarily handicapped in some instances by frivolous objections, the public will be protected in other instances against the needless burden and vexation of proceedings which may be instituted without legal justification. There is an obvious difference between the present case, wherein the district court exercises a jurisdiction expressly given to it by the statute, and those cases, such as *Myers* v. *Bethlehem Corp.,* 303 U. S. 41, and *Newport News Co.* v. *Schauffler,* 303 U. S. 54, in which without express statutory authority a court is asked to enjoin an administrative proceeding as being contrary to law. Indeed, the very difference is noted in the *Myers* case, where it is said that

"appropriate defense may be made" to an application for the enforcement of an administrative subpoena. 303 U. S. at 49.

Just how much of a showing of statutory coverage should be required to satisfy the district court, and just how far it should explore the question, are difficult problems, to be solved best by a careful balancing of interests and the exercise of a sound and informed discretion. If the proposed examination under the subpoena or the proceeding itself would be relatively brief and of a limited scope, any doubt should ordinarily be resolved in favor of the agency's power. If it promises to be protracted and burdensome to the party, a more searching inquiry is indicated. A formal finding of coverage by the agency, which the Secretary did not make here, should be accorded some weight in the court's deliberation, unless wholly wanting in either legal or factual support, but it should not be conclusive. In short, the responsibility resting upon the court in this situation is not unlike that of a committing magistrate on preliminary examination to determine whether an accused should be held for trial.

With these considerations in mind, let us turn to the facts of this case. Petitioner has willingly complied with all demands of the Secretary relating to the plants of its establishment, named in the contracts, in which the shoes were manufactured. It resists the application for enforcement of the subpoenas directing the production of records of other plants, not named in the contracts, in which some component parts for the shoes were manufactured, on the ground that the Walsh-Healey Act does not extend to those plants. It is true that petitioner voluntarily entered into the contracts with the Government, but those referred only to the specific plants where the finished product was made. And, it was not until 1939, after all the contracts were completed, that the Secretary issued rulings specifically deal-

ing with "integrated establishments." [9]  The mere fact that petitioner voluntarily contracted with reference to some plants does not necessarily mean that the Secretary is free to investigate petitioner's entire business without let or hindrance.  That depends upon whether or not the Act extends to those other plants.  Petitioner was entitled to have this question determined by the district court before the subpoena was enforced over its objection.

In view of the opinion of the Court, there is no reason for discussing whether the district court correctly construed the scope of the Walsh-Healey Act, or whether it conducted its examination in accordance with the principles I have attempted to outline in the course of this opinion.  It is enough to say that I am of opinion that under the facts of this case the district court should not be compelled mechanically to enforce the Secretary's subpoena, in the exercise of its statutory jurisdiction.  It should first satisfy itself that probable cause exists for the Secretary's contention that the Act covers the plants in question.

MR. JUSTICE ROBERTS joins in this dissent.

---

[9] Rulings and Interpretations under the Walsh-Healey Public Contracts Act, No. 2.