**UNITED STATES of America et al.,
Petitioners-Appellees,**

v.

**EMPIRE GAS CORPORATION et al.,
Respondents-Appellants.**

No. 8–3.

Temporary Emergency Court of Appeals.

Argued Nov. 11, 1976.

Decided Dec. 8, 1976.

Certiorari Denied March 7, 1977.
See 97 S.Ct. 1326.

Donald H. Loudon, Morris, Larson, King, Stamper & Bold, Kansas City, Mo., with whom Harry A. Morris and Steven G. Emerson, Kansas City, Mo., were on brief for respondents-appellants; Gibbs, Roper, Loots & Williams, Milwaukee, Wis., of counsel, on brief.

Barrie L. Goldstein, Atty., Dept. of Justice, Washington, D.C., with whom Rex E. Lee, Asst. Atty. Gen. and Stanley D. Rose, Atty., Dept. of Justice, Washington, D.C., were on brief for petitioners-appellees.

Before CHRISTENSEN, INGRAHAM and ESTES, Judges.

ESTES, Judge.

This is an appeal from an August 9, 1976 order of the District Court for the Western District of Missouri enforcing 61 subpoenas issued by the Federal Energy Administration (FEA) to a retail marketer of propane, Empire Gas Corporation (Empire), and 60 of its subsidiaries (appellants). Empire and its approximately 300 subsidiaries are subject to FEA's Mandatory Petroleum Allocation and Price Regulations, 10 C.F.R. Parts 210, 211 and 212.

The FEA began an audit of appellants' books and records in October, 1974, to determine whether there was compliance with FEA's regulations during the period February through October, 1974. On or about January 15, 1975, the audit was suspended at the request of appellants. In order to obtain documents and information for completion of the pending audit, the FEA issued to Empire and its subsidiaries the 61 subpoenas, the enforcement of which is at issue here.

In the interim between the initial audit and the subsequent issuance of the present subpoenas, Empire submitted, on September 2, 1975, to the General Counsel of FEA a Request for Interpretation of 10 C.F.R.

Part 212, Subpart F, regarding the meaning of the FEA pricing regulations affecting its sales [designated Record on Appeal (D.R.) at 232]. On May 28, 1976, the FEA issued an interpretation to Empire "which does not support Empire's position," and Empire appealed that interpretation (D.R. 241). On October 1, 1976, the appeal was denied.

In October, 1975, the FEA issued subpoenas directing the appellants to appear, testify, and produce various books, records, and documents relating to the prices charged by appellants. Pursuant to 10 C.F.R. § 205(h)(1), Empire filed with FEA a motion to quash or suspend the above-mentioned subpoenas, which motion was denied. Appellants continued to refuse to comply with the subpoenas.

On January 29, 1976, the United States of America brought this action on behalf of the FEA for enforcement of the subpoenas.

On August 9, 1976, the district court found that the subpoenas were enforceable; denied appellants' motion to certify constitutional issues to this court pursuant to § 211(c) of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note (ESA), as incorporated by reference in § 5(a) of the Emergency Petroleum Allocation Act of 1973, as amended, 15 U.S.C. § 751, *et seq.* (EPAA); and ordered the appellants to appear and give testimony before the appellees. The court further ordered that the appellants "make available for inspection and copying at the headquarters of Empire Gas Corporation all documents, records, and materials required by the subpoenas." (D.R. at 263).

On August 13, 1976, the appellants filed motions, *inter alia,* requesting a stay of the district court order of August 9, 1976; and on September 1, 1976, appellants filed a Motion to Modify the Court's Order enforcing the administrative subpoenas. On September 3, 1976, the court denied appellants' August 13 motions and, without ruling on the Motion to Modify, ordered the appellants to comply with the subpoenas by Sep-

tember 18, 1976. This court granted the stay on September 22, 1976.

The appellants base their resistance to enforcement of the subpoenas on three contentions: (1) that the subpoenas were issued to determine compliance with FEA regulations, 10 C.F.R. Parts 210, 211 and 212, which regulations are arbitrary, vague, and unconstitutional; (2) that the district court erred in not modifying the scope of the subpoenas to preclude reexamination by the FEA of records previously made available to the FEA; and (3) that the transfer of functions from the FEA, its administrator, officers and agents, to the Federal Energy Office (FEO), its administrator, officers and agents, was invalid, unauthorized, and unconstitutional, resulting in the expiration of the authorization for the subpoenas and, hence, termination of this subpoena enforcement action.

*Laws, Regulations and Rulings Involved*

The pertinent provisions of the statutes and regulations and FEA rulings involved are summarized, as follows:

A. *Statutory Provisions Involved*

Two statutes, the EPAA and the Federal Energy Administration Act of 1974, 15 U.S.C. § 762, *et seq.* (FEAA), authorize the FEA to obtain data and information from parties subject to regulations issued pursuant to their mandates.[1]

Sections 13(b) and (e) of the FEAA, 15 U.S.C. §§ 772(b) and (e), specifically authorize the Administrator of the FEA to collect information and to issue subpoenas to compel the appearance of witnesses or the production of documents and records:

§ 13(b), 15 U.S.C. § 772(b)—All persons owning or operating facilities or business premises who are engaged in any phase of energy supply or major energy consumption *shall make available to the Administrator* such information and periodic reports, records, documents, and other data, relating to the purposes of this Act, including full identification of all data

---

1. The procedures for implementing FEA's statutory authority to collect data and information by subpoena are set forth in FEA's procedural regulations at 10 C.F.R. § 205.8.

and projections as to source, time, and methodology of development, as the Administrator may prescribe by regulation or orders as necessary or appropriate for the proper exercise of functions under this Act.

\* \* \* \* \* \*

§ 13(e)(1), 15 U.S.C. § 772(e)(1)—The Administrator, or any of his duly authorized agents, *shall have the power to require by subpoena the attendance and testimony of witnesses, and the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence which the Administrator is authorized to obtain pursuant to this section.* [Emphasis added.]

Section 13(e)(2) of the FEAA, 15 U.S.C. § 772(e)(2), also provides that the agency may seek judicial enforcement of its subpoenas in any appropriate United States district court:

> (2) Any appropriate United States district court may, in case of contumacy or refusal to obey a subpoena issued pursuant to this section, issue an order requiring the party to whom such subpoena is directed to appear before the Administration and to give testimony touching on the matter in question, or to produce any matter described in paragraph (1) of this subsection, and any failure to obey such order of this court may be punished by such court as a contempt thereof.

Similarly, the EPAA provides authority to issue subpoenas and to obtain judicial enforcement thereof. Section 5(a)(1) of the EPAA incorporates by reference Section 206 of the ESA, 12 U.S.C. § 1904 note, which states:

> The head of an agency exercising authority under this title, or his duly authorized agent, shall have authority, for any purpose related to this title, to sign and issue subpoenas for the attendance and testimony of witnesses and the production of relevant books, papers, and other documents, and to administer oaths. Witnesses summoned under the provisions of this section shall be paid the same fees and mileage as are paid to witnesses in the

courts of the United States. In case of refusal to obey a subpoena served upon any person under the provisions of this section, the head of the agency authorizing such subpoenas, or his delegate, may request the Attorney General to seek the aid of the district court of the United States for any district in which such person is found to compel such person, after notice, to appear and give testimony, or to appear and produce documents before the agency.

## B. *FEA Pricing Regulations*

The present petroleum pricing regulations of the FEA originated from the mandatory petroleum pricing program of the Cost of Living Council (CLC) and were established during Phase IV of the Economic Stabilization Program. In January, 1974, the FEA, pursuant to Executive Order 11748, 38 F.R. 33575 (December 6, 1973), adopted without substantial change the CLC's Phase IV price regulations respecting crude oil and petroleum products. 39 F.R. 1924, *et seq.* (January 15, 1974). Section 212.93 of the original FEA price regulations was derived from § 150.359 of the CLC regulations and sets forth the price rule governing sales of petroleum products, including propane, by resellers and retailers like Empire and its subsidiaries.

The original § 212.93 of the FEA's regulations required that the maximum lawful price for a covered product be determined by taking the weighted average price at which the seller firm lawfully priced the covered product in transactions with the *class of purchaser* involved on May 15, 1973, and adding an amount which reflected, on a dollar-for-dollar basis, any *increased product costs* which the firm had incurred since that date. 10 C.F.R. § 212.93(a). These increased product costs were required to be spread equally across all of that product which the firm had in inventory and applied equally to all purchasers for the purpose of determining the seller's maximum lawful selling price. Increased product costs which a firm was unable to pass through to its customers in a given month could be accu-

mulated (or "banked") and passed through in future months. 10 C.F.R. § 212.93(e). Also, the selling price could be increased to reflect certain nonproduct cost increases of the seller. 10 C.F.R. § 212.93(b).

Since January 15, 1974, § 212.93 has been amended several times. For example, in April, 1974, FEA amended § 212.93(b) to permit retailers like Empire to increase the selling prices for propane in order to reflect certain nonproduct cost increases. 39 F.R. 12019 (April 2, 1974). Furthermore, in November, 1974, FEA established a 10 percent limit on the amount of "banked costs" which may be used for price increases in a single month. 39 F.R. 39259 (November 6, 1974). In addition, FEA implemented a change in December, 1974, in the pricing of propane by permitting unequal application among classes of purchasers of increased product costs.

## C. FEA Ruling

On March 7, 1975, FEA issued Ruling 1975–2, 3 CCH *Energy Management* ¶ 16,-042, entitled "Application of the Term 'Class of Purchaser' under FEA Petroleum Price Regulations," 40 F.R. 10655. Ruling 1975–2 interprets the manner in which the class of purchaser doctrine, initially established by the CLC and carried forward by the FEA, is to be applied. Under this ruling, the doctrine applies to all sales of covered products by resellers, like Empire, whose price must be based on the prices they charged various classes of purchasers for a particular product on May 15, 1973.[2]

I. The District Court Properly Enforced the Subpoenas Issued to Determine Compliance with the FEA's Mandatory Allocation and Pricing Regulations.

■ A. The appellants' contention that the FEA pricing and allocation regulations contained in 10 C.F.R. Parts 210, 211, and 212 for the pricing and allocation of crude oil and refined petroleum products, including propane, are unconstitutional because they are arbitrary, vague and ambiguous does not constitute a valid defense in this subpoena enforcement proceeding. At page 15 of their brief, appellants state:

The crux of Appellants' objections is simple: application of the substantive regulations contained in 10 C.F.R. Parts 210, 211 and 212 is left to the arbitrary power of the FEA because there is no objective way, given the illusory definitions of "firm", "supplier", "retailer", etc. contained therein, of applying the price and allocation rules to complex business entities such as Empire and its subsidiaries.

Appellees correctly respond that appellants cannot resist enforcement of the subpoenas solely on the ground of alleged unconstitutionality of regulations which the appellees can not determine were violated until they have examined the subpoenaed information.

■ As the cases discussed below illustrate, a court need not determine that the regulatory scheme is valid and constitutional prior to issuing an order enforcing an agency subpoena.

In *Oklahoma Press Publishing Company v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1945), the Supreme Court rejected the petitioners' argument that the Administrator of the Wage and Hour Division of the Department of Labor could not enforce a subpoena without a prior adjudication that the act in question covered the petitioners' activities. The acceptance of the petitioners' contention "would stop much if not all of investigation at the threshold of inquiry. . . ." 327 U.S. at 213, 66 S.Ct. at 508. The Court, in language now regarded as establishing the le-

---

2. "By way of explanation and numerous examples, FEA's Ruling 1975–2 provided extensive and necessary clarification of the application of the CLC/FEA class of purchaser doctrine to the myriad transactions which can arise in the sale of crude oil and petroleum products. Consequently, the guidance contained in Ruling 1975–2 is applicable to sales made by Empire under the CLC/FEA regulations and the information which the FEA needs to complete its audit of Empire is in large measure determined by that Ruling." Appellees' (Government's) Brief, pp. 6–7.

gal standard to be applied in subpoena enforcement proceedings, held that "[i]t is enough that the investigation be for a lawfully authorized purpose within the power of Congress to command." 327 U.S. at 209, 66 S.Ct. at 505. In the instant case, the appellants have admitted that they are subject to the FEA's Mandatory Petroleum Allocation and Price Regulations. (Brief at 3). Accordingly, the subpoenas were issued for a lawful purpose and are entitled to enforcement.

The validity of a subpoena issued by the Secretary of Labor in administrative proceedings under the Walsh-Healey Public Contracts Act was disputed in *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943). The corporation resisted enforcement of the subpoena based, *inter alia,* on the allegedly "arbitrary, artificial, unreasonable, discriminatory, and capricious" (317 U.S. at 507, 63 S.Ct. at 342) nature of a ruling by Secretary Perkins that the Act applied to petitioner. The Court rejected the argument and held:

> Nor was the District Court authorized to decide the question of coverage itself. The evidence sought by the subpoena was not plainly incompetent or *irrelevant* to any lawful purpose of the Secretary in the discharge of her duties under the Act, and it was the duty of the District Court to order its production for the Secretary's consideration. The Secretary may take the same view of the evidence that the District Court did, or she may not. The consequence of the action of the District Court was to disable the Secretary from rendering a complete decision on the alleged violation as Congress had directed her to do. . . . [317 U.S. at 509, 63 S.Ct. at 343, emphasis added].

The Supreme Court dismissed petitioner's assertions relating to "the meaning of the contract and the Act as implemented by administrative rulings in existence at the time of the making and performance of the

contract . . . ." (317 U.S. at 509 note 11, 63 S.Ct. at 343), by stating:

> The petitioner has advanced many matters that are entitled to hearing and consideration in its defense against the administrative complaint, *but they are not of a kind that can be accepted as a defense against the subpoena.* [Emphasis added; *id.*].

The similarity between the arguments appellants urge we accept and those rejected by the Supreme Court in *Endicott Johnson* is apparent. The district court correctly held that the "determination of the applicability or validity of agency regulations is not a condition precedent to enforcement of an agency subpoena. Indeed, to find otherwise would . . . permit regulated parties an end run attack upon regulation whenever they found themselves broken at the center." (D.R. 260–261).[3]

In *Myers v. Bethlehem Corporation,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938), petitioner sought to enjoin the National Labor Relations Board from holding a hearing for the alleged reason that the Board lacked jurisdiction over it. The petitioner argued that it should not be subjected to a futile, expensive, and vexing hearing. As the district court noted below, the Supreme Court held that the petitioner's contention of irreparable damage was

> at war with the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. . . . Obviously, the rule . . . cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage. Lawsuits also often prove to have been groundless; but no way has been discovered of relieving a defendant from the

---

**3.** This is only the commencement of administrative procedures which must be exhausted prior to agency determination of violations of the Mandatory Allocation and Price Regula- tions. *See City of New York v. New York Telephone Co.,* 468 F.2d 1401, 1402 (Em.App. 1972).

necessity of a trial to establish the fact. [303 U.S. at 50, 58 S.Ct. at 464.]

In fact, the only case cited by the appellants in which the subpoenas were held to be unenforceable was *Shasta Minerals & Chemical Co. v. Securities & Exchange Commission,* 328 F.2d 285 (10 Cir. 1964). The unrebutted affidavits which the *Shasta* appellants submitted to the district court described systematic persecution and harassment by the S.E.C. *Shasta* held that it was an appropriate exercise of judicial review, since the agency admitted the truth of the affidavits for purposes of a motion for summary judgment, to determine whether the S.E.C. was acting arbitrarily or outside the scope of its authority. 328 F.2d at 288. No element of harassment is present in this case, so *Shasta* is clearly distinguishable.

Section 307 of *Davis on Administrative Law,* cited by appellants (Brief p. 6), deals with the privilege against self-incrimination in subpoena enforcement proceedings, and it does not support the contention that it is a prerequisite to enforceability of these subpoenas that the regulatory scheme with which the appellants must comply be determined valid. Rather, it is stated in Section 307 that "a corporation . . . enjoy[s] no privilege against self incrimination and that [its] representatives similarly enjoy no privilege against self incrimination with respect to the records of the organization . . . .," supported by *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911). Justification for this rule is stated in *United States v. White,* 322 U.S. 694, at 701, 64 S.Ct. 1248, at 1252, 88 L.Ed. 1542:

Basically, the production of the records of any organization, whether it be incorporated or not, arises out of the *inherent and necessary power of the federal and state governments to enforce their laws,* with the privilege against self-incrimination being limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records. [Emphasis added].

The appellants contend that enforcement of the subpoenas prior to a judicial determination of the validity of the FEA's Mandatory Allocation and Pricing Regulations will deny them effective relief. The substance of this contention is at page 19 of the appellants' brief:

[They] anticipate that the appellees will respond to the above arguments by claiming that the objections are premature because no Notice of Probable Violation or Remedial Order has as yet been issued. However, no effective relief can be granted against the burden of complying with unconstitutional FEA subpoenas unless the constitutional issues are decided prior to compliance. The issues are clearly framed, the Appellants face immediate hardship, and the resolution of these issues will have sufficient immediate impact to satisfy any ripeness test posed by the court. No relief from the burden of the subpoenas can be granted to the Appellants if, after producing all their records for audit, it is determined that the regulations are invalid. Conversely, if the regulations are valid, no harm will inure to the FEA by being required to wait somewhat longer for the records, given that the information on the records themselves will not change. To defer the resolution of these issues is to deny the Appellants effective relief. Moreover, the Appellants are obligated to raise their constitutional objections at the earliest available stage lest the objections be waived.

This argument must be rejected. If the FEA determines that the appellants have violated the Mandatory Allocation and Price Regulations after examination of the subpoenaed information, the appellants will have an opportunity first to challenge those regulations in the administrative forum and later to seek judicial review.

The district court correctly stated: "It is, of course, significant that the applicability of the regulations to respondents cannot be determined until the information sought by subpoena is made available to the FEA investigators." (D.R. at 258 259).

## II. The District Court Properly Refused to Modify the Scope of the Subpoenas.

Appellants contend that the district court erred in not modifying the scope of the subpoenas to preclude reexamination of documents and records previously made available in connection with the FEA audit commenced October 29, 1974. Administrative subpoenas should be enforced if the information sought is relevant. *United States v. Morton Salt,* 338 U.S. 632, 641–643, 70 S.Ct. 357, 94 L.Ed. 401 (1949); *Endicott Johnson v. Perkins, supra,* 317 U.S. at 509, 63 S.Ct. 339; 1 Davis, *Administrative Law Treatise,* § 306, pp. 188–189 (1958). The information sought relates to the appellants' prices, costs, sales, purchases and receipts and is unquestionably relevant. The district court properly concluded (D.R. p. 259) that

> respondents' [appellants'] assertion of the burden inherent in providing the subpoenaed documents and the resulting interruption of Empire's business operations fails to demonstrate a deprivation of due process of law, particularly in view of petitioners' [appellees'] willingness to make inspection of the documents at Empire's headquarters and make copies of any materials necessary for completion of the audit. Thus, respondents have failed to raise a substantial constitutional issue sufficient to require certification to the Temporary Emergency Court of Appeals and this Court has jurisdiction to determine enforceability of the subpoenas. *See Delaware Valley Apartment House Owners Ass'n v. United States,* 350 F.Supp. 1144, 1149–50 (E.D.Pa.1973), *aff'd* 482 F.2d 1400 (Em.App.1973).

Although the retail price reports of all appellants were made available in the course of the October 29, 1974, audit, the FEA focused only on the December part of the audit containing daily log sheets of 32 Empire subsidiaries. (Stipulation filed May 17, 1976; D.R. 199). Appellants maintain that this duplication of production of documents imposes an unnecessary burden, but they admit in their brief at p. 25 that "no specific evidence is contained in the record as to the precise degree of overlap." Appellants have not shown that the information sought by the subpoenas is unnecessarily duplicative; and the contention that they should be modified is denied.

## III. The Administrator of the FEA Had Authority for Issuance and Judicial Enforcement of the Subpoenas, Correctly Enforced by the District Court.

Appellants' assertion that the temporary expiration [4] of the FEAA on July 30, 1976, both rendered the subpoenas unauthorized and removed the authority of the FEA Administrator to continue the subpoena enforcement action must be denied for the reasons discussed below. First, the general saving statute, 1 U.S.C. § 109,[5] is applicable to the case *sub judice.* Inter-

---

**4.** The FEAA, which provided for the existence of the FEA and its Administrator, expired on July 30, 1976. Due to the expiration, the President issued Executive Order No. 11930, 41 F.R. 32399 (August 3, 1976), on July 30, 1976, establishing a Federal Energy Office (FEO) within the Executive Office of the President. Pursuant to Section 6 of Executive Order 11930, the Administrator of the newly-created FEO was given all of the authority of the defunct Administrator of the FEA. That authority included the power vested in the President by the EPAA. *See,* Executive Order No. 11790, 31 F.R. 23185 (June 27, 1974). On August 14, 1976, the Energy Conservation and Production Act, P.L. 94–385, 2 CCH *Energy Management* ⌐ 10,450, was signed as a law. Section 112(a) of the Energy Conservation and Production Act extends the FEAA through December 31, 1977, and Section 112(b) of the act provides that the extension should be effective as of July 30, 1976. As a result, the President terminated the FEO in Executive Order No. 11933, 41 F.R. 36641 (August 31, 1976).

**5.** This statute provides in pertinent part:

> § 109. *Repeal of statutes as affecting existing liabilities.*
>
> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. The expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the temporary statute shall so ex-

preting *Allen v. Grand Central Aircraft Company,* 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1953), this court, in *United States v. State of California,* 504 F.2d 750, 754 (Em.App.1974), *cert. denied,* 421 U.S. 1015, 95 S.Ct. 2423, 44 L.Ed.2d 684 (1975), stated:

> [T]he "precise object of the general savings statute is to prevent the expiration of a temporary statute from cutting off appropriate measures *to enforce* the expired statute in relation to violations of it, or of regulations issued under it, occurring before its expiration." 347 U.S. at 554–555, 74 S.Ct. at 756 [emphasis added].

Thus, actions in the nature of pending enforcement proceedings survive the expiration of the ESA; and by the same reasoning, such actions survive the expiration of the FEAA. *Accord, Tasty Baking Company v. Cost of Living Council,* 529 F.2d 1005, 1009–11 (Em.App.1975). Cf. *People of State of California, State Lands Com'n v. Simon,* 504 F.2d 430 (Em.App.1974).

The instant subpoena enforcement action was instituted on January 20, 1976, a date when the FEAA was in effect; and it survives as a pending enforcement proceeding initiated prior to the expiration of the FEAA, which act survives any termination by virtue of the saving provision in ESA Section 218. *Tasty Baking Company v. Cost of Living Council,* 529 F.2d at 1010–11.

Second, the President has the power to "delegate all or any portion of the authority granted to him under this Act to such officers, departments, or agencies of the United States . . . as he deems appropriate." EPAA § 5(b). That Presidential authority includes the subpoena enforcement power contained in Section 206 of the ESA. Thus, the congressional grant within the EPAA of power to delegate enabled the President to establish the FEO and to grant its Administrator subpoena enforcement authority identical to that previously given the Administrator of the FEA by the provisions of FEAA Sections 13(e)(1) and 13(e)(2).

Third, the legislative history reflects that Congress intended for the FEA to continue its functions in an uninterrupted fashion. According to the conference committee on the Energy Conservation and Production Act:

> The conferees completed their work on this legislation on July 30, 1976. Because the conference report could not be filed and acted upon by both Houses and presented to the President before the expiration of the Agency, the conferees added language to the bill to make the extension retroactive. It is the intent of the conferees that this retroactive provision have the effect of permitting the organic Act to continue uninterrupted. *Further, it is the intent of the conferees that the Agency, its functions (including pending regulatory matters),* appointments and other personnel matters, prior obligations and programs, *shall be deemed to have continued uninterrupted despite the brief period between July 30th, 1976 and the effective date of this legislation.*
>
> The conferees are aware that, because of the necessity to continue existing energy programs, the President issued Executive Order No. 11930 on July 30th establishing a Federal Energy Office (FEO) in the Executive Office of the President. The conferees do not intend to suggest that actions taken during the hiatus peri-

---

pressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

The Energy Policy and Conservation Act (EPCA), P.L. 94–163, December 22, 1975, amends and extends the EPAA through September 30, 1981; thereafter, the district courts and this court will have continuing jurisdiction over actions within the meaning of the general saving statute, 1 U.S.C. § 109, and the new saving statute, EPAA § 18, as amended by the EPCA. The amended saving statute, EPAA § 18, added by EPCA § 461, explicitly provides: [S]uch expiration shall not affect any action or pending proceedings, administrative, civil, or criminal, not finally determined on such date [September 30, 1981], nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date.

od by the FEO and consonant with the procedures required by the FEA Act would be invalidated by this Act. [Conf. Rep. No. 94–1119, 94th Cong., 2d Sess., p. 68 (1976); emphasis added; U.S.Code Cong. & Ad.News Pamphlet No. 8, p. 3199 at 3216].

Appellants mistakenly rely upon *Fleming v. Mohawk Wrecking and Lumber Company,* 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375 (1946). There the Supreme Court held that the President had authority to transfer subpoena enforcement power from the Federal Works Administrator, an officer appointed by the President and confirmed by the Senate, to the Temporary Controls Administrator, a juridical creation of the President. The Court recognized that it would be inconsistent to require "an officer, previously confirmed by the Senate" to be "once more confirmed in order to exercise the powers transferred to him by the President." 331 U.S. at 118, 67 S.Ct. at 1132. The Court considered congressional intent:

> Any doubts on this score would, moreover, be removed by the recognition by Congress in a recent appropriation of the status of the Temporary Controls Administrator. That recognition was an acceptance or ratification by Congress of the President's action in Executive Order No. 9809. . . . [331 U.S. at 118–119, 67 S.Ct. at 1133].

The situation in the case before this court is not unlike that in *Fleming.* The President was given specific authority to grant subpoena enforcement power to the Administrator of the FEO, an individual who was confirmed by the Senate, and the Congress ratified his action in enacting the Energy Conservation and Production Act, P.L. 94–385 (August 14, 1976), 2 CCH *Energy Management* ¶ 10,450.

Even if there were any validity to appellants' assertion that the FEA Administrator's authority to enforce the subpoenas did not continue, the appellants overlook the authorization of delegation of subpoena power granted by ESA Section 206 as incorporated by EPAA Section 5(a)(1), which provides in pertinent part:

§ 206. *Subpoena power.*

The head of an agency exercising authority under this title, or his duly authorized agent, shall have authority, for any purposes related to this title, to sign and issue subpoenas for the attendance and testimony of witnesses and the production of relevant books, papers, and other documents. . . . In case of refusal to obey a subpoena served upon any person under the provisions of this section, the head of the agency authorizing such subpoena, or his delegatee, may request the Attorney General to seek the aid of the district court of the United States for any district in which such person is found to compel such person, after notice, to appear and give testimony, or to appear and produce documents before the agency.

Clearly, appellees relied upon this section of the statute in their Petition for Enforcement (D.R. at 1), and plainly this is an independent basis for the Administrator's continued exercise of subpoena enforcement authority.

The order of the district court appealed from is AFFIRMED.

