**FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, Plaintiff,**

v.

**Paul HINCH, individually, et al., Defendants.**

No. 94–C–728–K.

United States District Court, N.D. Oklahoma.

March 6, 1995.

Pamela H. Goldberg, James M. Reed, R. Mark Petrich, Hall Estill Hardwick Gable Golden & Nelson, Tulsa, OK, for F.D.I.C.

W. Robert Dyer, Joseph W. Spence, Gardere & Wynne, Dallas, TX, Steven J. Adams, Gardere & Wynne, Tulsa, OK, Mary C. Coulson, Gooding Mulinix & Belanger, Oklahoma City, OK, for Paul D. Hinch.

Joel Wohlgemuth, Norman & Wohlgemuth, Tulsa, OK, Beth Ann Blackwood, Dallas, TX, for Mary C. Hinch.

Randall G. Vaughan, J. Warren Jackman, Pray Walker Jackman Williamson & Marlar, Tulsa, OK, Tom Thomas, Marc S. Culp, Thomas Sheehan & Culp, Dallas, TX, Joel Wohlgemuth, Norman & Wohlgemuth, Tulsa, OK, Beth Ann Blackwood, Dallas, TX, for Phillip D. Hinch, Grant Hinch, Oklahoma Columbia Property Co., Hinch Partners, Property Co. of America Realty, Inc., Property Co. of America Management, Inc., Property Company of America Services Corp.

## ORDER

KERN, District Judge.

This is a suit by the FDIC as a judgment creditor to set aside certain "trusts" and partnerships as shams that were allegedly created by or for the benefit of judgment debtor Paul D. Hinch as part of a scheme to defraud creditors. The judgment debts at issue arose out of real estate related transactions entered into in 1984 and 1985 by Plaintiff's predecessors in interest and Paul Hinch, among others. The FDIC holds two judgments against Paul Hinch and has filed this suit against him, his wife, sons, and their companies, as well as three family trusts, attempting to collect the debt under 12 U.S.C. § 1821(d)(17)–(19), as well as fraudulent transfer and alter ego theories.

Now before the Court are a Motion to Dismiss and two motions for Summary Judgment. The Defendants who have filed the Motion to Dismiss and the first Motion for Summary Judgment are: Mary C. Hinch, individually; Phillip D. Hinch individually and as Trustee for the Hinch Life Insurance Trust, the Mary C. Hinch Management Trust, and the Hinch Family 1988 trust; Grant Hinch, individually and as Trustee for the Hinch Life Insurance Trust, the Mary C. Hinch Management Trust and the Hinch Family 1988 Trust Number Two; Oklahoma Columbia Property Limited Partnership ("Columbia Property Company"); Hinch Partners, a Texas Partnership; Property Company of America Realty, Inc. ("PCA Management"); and Property Company of America Services Corporation ("PCA Services"). For purposes of this Order, the "Defendants" refers to those individuals and entities listed above but excluding Paul Hinch.

In addition, Defendant Paul Hinch has filed a Motion for Summary Judgment. When Paul Hinch is referred to, the Court will state, "Defendant Hinch" or "Paul Hinch." In this Order, the Court considers a Motion by the Defendants to Dismiss, a Motion by Defendants for Summary Judgment, and a Motion by Defendant Hinch for Summary Judgment.

## I. *Facts*

The judgment debts at issue arise out of commercial transactions entered into in 1984 and 1985, between Plaintiff's predecessors in interest and Paul Hinch, among others. Paul Hinch was for many years in the business of investing in and developing real estate in Oklahoma, Texas, and surrounding areas, and was a principal of Property Company of America, Inc. ("PCA"). The debts incurred by Paul Hinch, as evidenced by the judgments held by the FDIC, arose through execution by Paul Hinch of certain notes and/or guaranty agreements previously held by a financial institution then called First RepublicBank Dallas, N.A. ("FRB Dallas").

On July 29, 1988, the Comptroller of the Currency declared FRB–Dallas insolvent and appointed the FDIC as receiver for FRB–Dallas ("FDIC–Receiver"). FDIC–Receiver then assigned certain assets of FRB–Dallas by way of a purchase and assumption agreement to JRB Bank, N.A., on July 29, 1988. On that same day, JRB Bank, N.A. changed its name to NCNB Texas National Bank ("NCNB Texas"). Various assets were transferred to NCNB Texas, including the various loans and all claims and causes FRB–Dallas had against Paul Hinch. NCNB Texas initiated litigation against Paul Hinch and others to collect on these loans after the principal obligors defaulted on them. NCNB Texas obtained judgments against Paul Hinch in two cases that were pending in Dallas County, Texas.

In 1988, NCNB Texas was chartered as a "bridge bank" under 12 U.S.C. § 1821(i) (recodified at 12 U.S.C. § 1821(n)) to assume over $30 billion in deposits and substantially all of the assets of forty failed First RepublicBanks in Texas, including the judgments referenced above upon which this action is based. The FDIC, in its corporate capacity ("FDIC–Corporate"), in turn, entered into an assistance agreement with NCNB Texas pursuant to 12 U.S.C. § 1823(c). This assistance agreement included an option which allowed NCNB Texas, in its sole discretion, to "put" to FDIC–Corporate assets that NCNB Texas had acquired from First RepublicBanks. Subsequent to the initiation of this litigation, NCNB Texas exercised its option under the assistance agreement, and FDIC–Corporate acquired on November 30, 1991 over 60,000 assets, including NCNB Texas' judgments which form the basis for this lawsuit.

The FDIC alleges that Paul Hinch and the other Defendants have taken a series of actions designed to defraud their creditors. The FDIC asserts that Paul and Mary Hinch "orchestrated" a purported move to Texas in order to designate as their "homestead" property located in Kerrville, Texas. Similarly, the FDIC asserts that Paul and Mary Hinch wrongfully tried to partition community property into separate property. The FDIC challenges the creation of various trusts by Paul and Mary Hinch as illusory as well as the partition and transfer of assets to those trusts. The FDIC further contests Paul Hinch's supposed transfer of assets to the Columbia Property Company in light of the fact that he continues to enjoy the full use, benefit, and control of those assets. The FDIC urges that all the partnerships and corporate defendants named in the Complaint are alter egos of Paul Hinch and their assets should be made available to Plaintiff for satisfaction of its judgments.

## II. *Motion to Dismiss by Defendants*

The Defendants have filed a Motion to Dismiss, arguing that: a) the FDIC may not rely on 12 U.S.C. § 1821(d)(17)–(19) for fraudulent conveyances occurring before the effective date of the statute; b) the FDIC lacks standing in its corporate capacity to bring its causes of action under 12 U.S.C. § 1821(d)(17)–(19); c) Phillip and Grant Hinch have no individual liability; d) the FDIC has no cause of action against these Defendants for allegedly failing to pay adequately for services rendered by Paul Hinch to them; and e) the FDIC's alter ego claims

do not entitle them to recover the assets of the alleged alter ego entity.

■ A complaint should not be dismissed unless it appears that the Plaintiff cannot prove facts entitling him to relief. *Curtis Ambulance of Fla., Inc. v. Board of County Comm'ners,* 811 F.2d 1371, 1374 (10th Cir. 1987).

*A. Retroactivity of 12 U.S.C. § 1821(d)(17)–(19)*

■ The Defendants assert that the FDIC is unable to bring any action against the Defendants based on the Comprehensive Crime Control Act of 1990 which is codified at 12 U.S.C. § 1821(d)(17)–(19). The Defendants point out that this legislation did not become effective until May 28, 1991, and all allegations in this case involve acts taken before that date. However, the FDIC urges this Court to find that the Act should be applied retroactively.

■ The Supreme Court has long embraced a presumption against retroactivity, giving voice to principles articulated in the Constitution prohibiting *ex post facto* laws and legislation impairing "the Obligations of Contracts." *See Landgraf v. USI Film Products,* —— U.S. ——, ——–——, 114 S.Ct. 1483, 1500–01, 128 L.Ed.2d 229 (1994). This presumption is strongest when there is no clear indication in the statute that Congress intended the Act to have retroactive effect. The relevant portions of the Crime Control Act for this case do not clearly state whether the courts should interpret them in a retroactive fashion. Thus, this Court must determine whether the general presumption against retroactivity has been overcome.

■ In the most recent analysis by the U.S. Supreme Court of the problem of retroactivity, *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court instructed courts to look at the issue of retroactive "operation" or "effect" rather than retroactive "application." Where a statute would have a retroactive effect, meaning that it would increase a party's liability for past conduct, the traditional presumption should govern.

[T]he court must determine whether the new statute would have retroactive effect, i.e., whether it would impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent a clear congressional intent favoring such a result.

—— U.S. at ——, 114 S.Ct. at 1505. In *Landgraf,* the plaintiff brought suit under the Civil Rights Act and attempted to invoke certain provisions regarding recovery of compensatory and punitive damages and the right to a jury trial. The Supreme Court held that absent clear Congressional intent to the contrary, a federal statute enacted after the occurrence of the conduct at issue should not be applied if it would increase a party's liability for past conduct.

The provisions at issue allow the FDIC or RTC to avoid transfers of interests in property made by "institution-affiliated parties" or debtors of the financial institution within five years of the date of the appointment of a receiver or conservator. The transfers must be made with the intent to hinder, delay, or defraud the institution or its conservator or receiver, or any other appropriate Federal banking agency.

In an analogous decision concerning a fraudulent transfer, one district court found that retroactive application of the statute was proper. *FDIC v. Yemelos,* 778 F.Supp. 329 (E.D.La.1991). Although the statute itself is silent on the issue of retroactivity, the court in *Yemelos* found that Congress intended the statute to be applied retroactively because such an interpretation was consistent with the FDIC's need to protect its solvency so that the FDIC would remain available to protect the deposits of the insured depositors in the nation's banks. *Id.* at 332. In so holding, the court found the provision more of a procedural tool for the FDIC, since the statute did not change any of the substantive rights of those charged with making fraudulent conveyances. *Id.*

Despite this holding by the District Court in *Yemelos* allowing retroactive application,

there is extremely little evidence of Congressional intent with regard to retroactivity. Given the recent *Landgraf* case, the important inquiry necessarily involves a determination of whether Congress' enactment of § 1821(d)(17)–(19) may "impair rights," "increase a party's liability," or "impose new duties." Although fraudulent transfers have always been subject to attack, Sections 1821(d)(17)–(19) provide new tools for enforcing obligations owed to the FDIC, including asset freezes and the setting aside of transfers which occurred five years before a receiver was appointed whether or not the conveyance was intended to defraud that particular depository institution.

Although neither party has provided the Court with any guidance as to Congressional intent, what little evidence this Court has discovered appears to weigh toward non-retroactivity of the statute. The House Report on the statute clearly states that:

> The legislation is intended to grant the Federal Deposit Insurance Corporation *authority in addition to that already existing* under Section 11(e)(3)(B) of the Federal Deposit Insurance Act (which grants the Corporation the authority to exercise any state law powers granted to a receiver or conservator to avoid fraudulent conveyances), and Section 11(c)(2)(B) of the Federal Deposit Insurance Act (which grants the corporation the authority to avoid any fraudulent conveyance that could otherwise be avoided by a conservator or receiver for any Federal depository institution).

H.R.Rep. 101–681(I), 101st Cong., 2d Sess. 1990, 1990 WL 188857, at p. 486–487 U.S.Code Cong. & Admin.News 1990, pp. 6472, 6587. (emphasis added). According to the legislative history, the statute was designed to enhance the powers of the FDIC in avoiding fraudulent transfers and thereby to increase potential liability of those who make fraudulent transfers. Since the Act is designed to strengthen the hand of the FDIC, retroactive *application* would have a retroactive *effect* as defined by the Supreme Court. Therefore, the traditional presumption of nonretroactivity should apply. One might also find that Congress explicitly intended

non-retroactive application, since Congress presumptively understood that the courts would only apply the law in a prospective fashion if it heightened liability for those engaged in unlawful transfers.

Moreover, this Court's decision is consistent with the holdings of the Tenth Circuit on retroactivity as expressed most recently in *Oklahoma Radio Associates v. FDIC,* 987 F.2d 685, 695 (10th Cir.1993). There, the Tenth Circuit held, "a statute is deemed to be effective only for the future·unless a contrary intent appears." *Id.* (citing *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) and *DeVargas v. Mason & Hanger–Silas Mason Co., Inc.,* 911 F.2d 1377 (10th Cir.1990), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991)). Although the *Oklahoma Radio* decision was issued before *Landgraf,* the *Bowen* decision, on which the Tenth Circuit relied, remains good law as does the presumption for prospectivity. *Landgraf,* —— U.S. at ——, 114 S.Ct. at 1501.

This conclusion does not mean, however, that the FDIC is prevented from seeking prospective relief based on application of the new provisions of the Crime Control Act. *Landgraf,* —— U.S. at ——, 114 S.Ct. at 1501. For instance, 12 U.S.C. § 1821(d)(18) allows a court, at the request of the Corporation, to issue an injunction that would place assets of a person under the control of the court. In one recent case, the Fifth Circuit explicitly reserved ruling on the retroactivity of 12 U.S.C. (d)(18)–(19) but upheld a preliminary injunction authorized under the law to restrain defendants from dissipating their property without prior approval of the court. *FDIC v. Faulkner,* 991 F.2d 262, 266 (5th Cir.1993). The court held, "Here, the application on the preliminary injunction provisions of the [Act] implicates future conduct, in the sense that the asset freeze applies only to future transfers of . . . assets." *Id.* Future application of the Act law would not alter the consequences of past conduct and thus would not raise the same difficulties associated with retroactive application.

Therefore, the Court grants summary judgment with regard to any claims based on

provisions of the Omnibus Crime Control Act, as codified at 12 U.S.C. § 1821(d)(17)–(19), that would avoid asset transfers made before the effective date of the legislation.

### B. Standing Under 12 U.S.C. § 1821(d)(17)

The Defendants argue that, in order to have standing under 12 U.S.C. § 1821(d)(17)–(19), the FDIC must be suing in its capacity as a *conservator or receiver.* In the events leading up to this litigation, the FDIC has been acting in its *corporate* capacity.

Such a limitation appears at first blush to be consistent with the express language of the relevant statutory provisions. However, 12 U.S.C. § 1823(d)(3)(A) states that "With respect to any asset acquired or liability assumed pursuant to this section, the Corporation shall have all the rights, powers, privileges, and authorities of the Corporation as receiver under Sections 1821 and 1825(b) of this title." Therefore, if FDIC–Corporate is acting under 12 U.S.C. § 1823, it would have the powers given to it by 12 U.S.C. § 1821.

Plaintiff provides a history of FDIC related actions relevant to the banks and judgments at issue. According to this chronology, FDIC–Corporate agreed to provide open bank assistance to First RepublicBank Dallas, N.A. ("FRB Dallas") and its Houston sister bank, First RepublicBank Houston, N.A. ("FRB Houston"), in the form of a $1 billion loan in March of 1988. Eventually, the Office of the Comptroller of the Currency declared all of the First RepublicBanks in Texas insolvent in July, 1988 and appointed FDIC as receiver for FRB Dallas and FRB Houston. As a result, FDIC–Receiver succeeded to the judgments against Paul Hinch.

Simultaneously, a "bridge bank" was chartered under 12 U.S.C. § 1821(n) to assume the liabilities of the failed banks. The bridge bank, JRB Bank, N.A., was thereafter acquired by NCNB Texas. FDIC–Corporate provided financial assistance to NCNB Texas pursuant to 12 U.S.C. § 1823(c). In November of 1991, NCNB Texas conveyed to FDIC–Corporate over 60,000 non-performing assets, including the judgments against Paul Hinch. Although accomplished in an indirect manner, FDIC–Corporate received the judgments while acting under 12 U.S.C. § 1823. Therefore, FDIC–Corporate has the same rights under 12 U.S.C. § 1821 as it would have had it been acting in its capacity as receiver or conservator.

Plaintiff points to two cases where courts have allowed the FDIC in its corporate capacity to take advantage of these provisions of the Crime Control Act, as codified at 12 U.S.C. § 1821(17)–(19). *FDIC v. Niblo,* 821 F.Supp. 441, 461 (N.D.Tex.1993); *FDIC v. Yemelos,* 778 F.Supp. 329 (E.D.La.1991). Defendants, however, try to distinguish those cases by saying that FDIC–Corporate obtained the liabilities in the those situations directly from FDIC–Receiver rather than from a bridge bank as was the situation in this case.

However, this distinction is not persuasive. FDIC–Corporate acquired these judgments pursuant to the assistance given to NCNB Texas under 12 U.S.C. § 1823(c), the statutory section authorizing assistance to insured depository institutions. According to 1823(d)(3)(A), the FDIC is granted the same rights, powers, privileges, and authorities with respect to any asset acquired or liability assumed from the FDIC as conservator or receiver. The statute gives the FDIC in its corporate capacity the same power to avoid fraudulent transfers under § 1821(d)(17)(A) as the FDIC would have as conservator or receiver. The mere fact that FDIC–Corporate acquired the judgments by means of a "bridge bank" should have no bearing on the FDIC's power to pursue those judgments. Defendants provide no principled argument for such a conclusion. Therefore, this Court finds that the FDIC has standing to sue under 12 U.S.C. § 1821(d)(17)(A) where the statute is otherwise applicable.

### C. Individual Claims Against Phillip and Grant Hinch

The critical question with regard to individual liability for Phillip and Grant Hinch involves a determination of the individual interests of these defendants in the lawsuit. According to the Plaintiffs, Phillip and Grant Hinch are the beneficiaries of the Hinch Family 1988 Trust, the Mary C. Hinch

Management Trust and the Hinch Life Insurance Trust ("the Trusts"). Furthermore, they are general partners of the Columbia Property Company, and are alleged to have been integrally involved in many of the conveyances complained of in the FDIC Complaint.

In this case, the FDIC seeks to recover assets of the Trusts as well as properties alleged to have been fraudulently transferred to the Columbia Property Company and other entities. The relief requested by the FDIC would require that Phillip and Grant Hinch be added in their individual capacities. Further, Phillip and Grant Hinch face potential individual liability based on any participation in the fraudulent transfers to various trusts. In *FDIC v. Martinez–Almodovar,* 671 F.Supp. 851 (D.P.R.1987), the court held a daughter and son-in-law liable in a similar context for damages for fraudulently conveying property to family corporations for which they served as directors and officers.

In response, Defendants cite *Walsh v. Centeio,* 692 F.2d 1239 (9th Cir.1982), to state that trust beneficiaries can only be joined in their individual capacities in certain types of actions. However, the *Walsh* case does not stand for the proposition asserted by Defendants. *Walsh* does not hold that beneficiaries of a trust can only be joined in an accounting or removal action but simply notes that beneficiaries typically are joined in those types of actions. Given the alleged role played by Phillip and Grant Hinch, claims against them in their individual capacities should not be dismissed.

#### D. Services Rendered by Paul Hinch

█ Plaintiffs rely on 12 O.S. § 850 to request this Court to determine the value of services rendered by Paul Hinch to the defendant entities. The statute provides that if salary or compensation is determined to be inadequate for the services rendered, the court may direct the *debtor* to make payment on account of the judgment based upon a reasonable value of the services rendered by the debtor. 12 O.S. § 850. As is clear from this statute, the FDIC may have an action against Paul Hinch for services he rendered without adequate compensation. The statute states:

> Where the *judgment debtor* claims or is proved to be rendering services to or employed by a relative or other person or by a corporation owned or controlled by a relative or other person, without salary or other compensation, or at a salary or compensation so inadequate as to satisfy the court that such salary or compensation is merely colorable and designed to defraud or impede the creditors of such debtor, the court may direct *such debtor* to make payments on account of the judgment, in installments, based upon reasonable value of the services rendered by such judgment debtor . . . .

*Id.* (emphasis added). While the statute contemplates an action against the judgment debtor, Paul Hinch, it does not authorize an action against the other Defendants, none of whom are judgment debtors. Therefore, any action against the Defendants based on 12 O.S. § 850 should be dismissed.

#### E. Alter Ego Theory

█ The Defendants allege that alter ego theory only applies to render individuals responsible for business debts but not to make business entities liable for individual debts. However, it is clear that alter ego doctrine also holds true in reverse piercing situations. *Permian Petroleum Co. v. Petroleos Mexicanos,* 934 F.2d 635 (5th Cir. 1991). Moreover, there is no requirement under Oklahoma law that Paul Hinch be a stockholder of the other entities in order to justify piercing the veil. *Home–Stake Production Company v. Talon Petroleum,* 907 F.2d 1012, 1018–20 (10th Cir.1990). Under Oklahoma law, a corporation may be deemed to be the mere instrumentality of an individual if the corporation is undercapitalized, without separate books, its finances are not kept separate from individual finances, individual obligations are paid by the corporation or vice versa, corporate formalities are not followed, or corporation is merely a sham. *Id.* at 1018. Given this range of factors, it is not appropriate to dismiss the alter ego claims against Paul Hinch simply because he is not a stockholder in the company.

### III. Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment with regard to the following issues. They argue that: the partition agreement entered into by Paul and Mary Hinch is valid; the Hinch's homestead designation is binding on the FDIC; and the FDIC's claims of fraudulent transfer are barred by the statute of limitations.

It should be noted that this Court is asked to grant summary judgment on several claims where intent is an important element. Although the role of intent does not preclude a summary judgment award, the courts have been directed to be particularly cautious in granting summary judgment where intent and motivation are at issue. *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir.1994).

### A. Depositions Used in Response to Summary Judgment Motion

▪ As a preliminary matter, there is an evidentiary question that must be resolved before analyzing the following issues raised by the summary judgment briefs. In its Response to Defendants Motion for Summary Judgment, the FDIC has submitted eight deposition transcripts from two different proceedings. Exhibits A, D, E, G, and H were taken in a case pursued in state court in Tulsa, Oklahoma, while the deposition transcripts attached as Exhibits B, C, and F were taken in a federal court action in Texas. According to the Defendants, these deposition excerpts are inadmissible because: the Defendants, with one exception, were not parties to the two cases; were not represented at the depositions; and there was not sufficient identity of issues to allow use of the depositions.

▪ In evaluating a motion for summary judgment, the Court has the duty to view the non-movant's case in its "most favorable light." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Given this obligation, the Court must consider the evidence of a non-moving party—even if it would be inadmissible in the form submitted—if it could be reduced to an admissible form for trial. *Cook v. Babbitt*, 819 F.Supp. 1, 25 (D.D.C.1993). In *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765 (8th Cir.1992), the Eighth Circuit pointed out that a deposition need not be admissible at trial in order to be considered *in opposition* to a motion for summary judgment. These depositions are not being used to bolster a motion for summary judgment but to defeat one. Therefore, this Court will review the depositions offered by the Plaintiff in determining whether the Defendants' Motion for Summary Judgment should be granted. This conclusion is consistent with the Court's obligation to view a motion for summary judgment in the light most favorable to the non-moving party.

### B. The Partition Agreement

▪ The sole basis for the claims against the Mary C. Hinch Management Trust is a February 14, 1986 marital property partition agreement between Paul and Mary Hinch and the subsequent transfer of the properties partitioned to Mary Hinch to the Mary C. Hinch Management Trust. The FDIC has alleged that the partition agreement should be set aside as a fraud on creditors, and, alternatively, that it is invalid under Oklahoma law. The FDIC challenges the partition agreement as an unenforceable contract, since it was allegedly created for unlawful purpose. *An–Cor, Inc. v. Reherman*, 835 P.2d 93, 96 (Okla.1992).

Whether or not the partition was made for an unlawful purpose depends upon whether the partition was made with an intent to defraud. In turn, this determination of intent involves factual questions which have yet to be determined. Further questions that have been raised involve whether Paul Hinch was insolvent at the time he executed the partition agreement and whether Paul Hinch received fair consideration for the transfer of assets and the obligations incurred under the partition agreement. The affidavit of Paul Hinch does not eradicate questions of intent with regard to the partition agreement. Therefore, summary judgment would not be appropriate with regard to the partition agreement.

## C. The Homestead Designation

■ The FDIC has challenged the validity of the designation by Paul and Mary Hinch of a Texas homestead. FDIC urges either that Paul and Mary Hinch never really changed their residence from Oklahoma to Texas or they abandoned their Texas homestead. According to the FDIC, Paul and Mary Hinch cannot legally own a Texas homestead and that the designation was done to defraud creditors.

■ Presently, Paul and Mary Hinch claim to live in Texas although they also lease a home in Tulsa from the Columbia Property Company. According to both Oklahoma and Texas courts, the issue of whether property has been established as a homestead is an issue of fact, depending upon overt acts and the intention of the owner to claim the land as a homestead. *Kunauntubbee v. Greer*, 323 P.2d 725, 731 (Okla.1958); *Lifemark Corp. v. Merritt*, 655 S.W.2d 310, 314 (Tex.Civ.App.1983).

■ While the initial burden of establishing the homestead character of a property in Texas is a low hurdle, *Matter of Bradley*, 960 F.2d 502, 507 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1412, 122 L.Ed.2d 783 (1993), the FDIC may disprove the existence of the homestead by challenging the intentions of Paul and Mary Hinch and their actual residence at the times relevant to the FDIC's claims. Questions of fact remain to be addressed with regard to the homestead designation of Paul and Mary Hinch, since they currently lease a house in Tulsa, Oklahoma where Mr. Hinch maintains a place of business.

■ Although courts should be wary to disturb a person's homestead designation, *Matter of Bradley*, 960 F.2d at 507, it would be premature to grant summary judgment on this claim. The FDIC charges that the homestead designation was merely a purported change of residency in order to take advantage of favorable Texas law and thereby protect personal and real property from creditors. Because these allegations involve factual determinations that are yet to be resolved, summary judgment is denied to the Defendants with respect to FDIC claims based on the homestead designation of Paul and Mary Hinch.

## D. Statute of Limitations

■ Almost all the claims in the Complaint require the FDIC to prove a fraudulent transfer. This action is subject, pursuant to 12 U.S.C. § 1821(d)(14), to either a six-year statute of limitations if the FDIC is pursuing a contract claim or a three-year statute of limitations if this action represents a tort claim. The statute states:

(A) **in general**

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

(I) the 6–year period beginning on the date the claim accrues; or

(II) the period applicable under state law; and

(ii) in the case of any tort claim, the longer of—

(I) the 3–year period beginning on the date the claim accrues; or

(II) the period applicable under State law.

12 U.S.C. § 1821(d)(14)(A). The statute further explains that a claim accrues on the later of the date of the appointment of the receiver or the date on which the cause of action accrues. 12 U.S.C. § 1821(d)(14)(B). While the FDIC argues that a fraudulent transfer claim should be considered a contract action, the Defendants urge this Court to interpret the suit as an action in tort.

Although there is very little case law on this point, it appears that the weight of authority suggests that a claim such as this should be analyzed as a contract action. Several courts have reasoned that the essence of this type of action is that of a creditor seeking payment from a debtor. *FDIC v. Martinez–Almodovar* 671 F.Supp. 851, 871 (D.P.R.1987); *United States v. Franklin Nat.'l Bank*, 376 F.Supp. 378 (E.D.N.Y.1973). In *Franklin*, the court held:

The gravamen of the cause of action of the case at bar is the ordinary right of a creditor to receive payment; this right has been implemented by the protection of legislation concerning the circumstances under which the creditor may avail himself of assets which the debtor has transferred to others.

671 F.Supp. at 871.

■ The logic of *Franklin* applies equally to the FDIC in this action. Moreover, as a general policy rule, it makes sense to use the longer statute of limitations when both may be applicable, and one of the limitations periods would prohibit the action. *Hughes v. Reed*, 46 F.2d 435, 440 (10th Cir.1931).

As acknowledged by the Plaintiffs, the FDIC filed suit two days prior to the end of the six-year statute of limitations period. The date on which the claim accrues, according to § 1821(d)(14) is the later of a) the date of the appointment of the Corporation as the conservator or receiver; or b) the date on which the cause of action accrues. The FDIC was appointed receiver for the FRB–Dallas, N.A., on July 29, 1988.

Therefore, this statute of limitations defense of the Defendants fails as a matter of law, and summary judgment is inappropriate on this basis.

**IV.  *Summary Judgment Motion by Defendant Hinch***

■ Defendant Paul Hinch has also filed a Motion for Summary Judgment. In this Motion, Defendant Hinch urges this Court to consider many of the issues already discussed in this Order.

First, Defendant Hinch argues that some of FDIC–Corporate's fraudulent transfer claims are barred by the statute of limitations. However, this Court has determined that the proper limitations period as set forth in § 1821(d)(14) is a six-year period rather than the time period asserted by Defendant Hinch. *Supra* Section III(D).

Second, Defendant Hinch argues that the fraudulent conveyance/asset freeze provisions of the Omnibus Crime Control Act cannot be applied retroactively. In fact, this Court has held that the relevant provisions increase the liability imposed on wrongdoers and thus should not be applied retroactively. *Supra* Section II(A).

Third, Defendant Hinch further argues that FDIC–"Corporate" has no standing under 12 U.S.C. § 1821(d)(17)–(19). Although the Court has rejected this argument concerning standing with regard to prospective application of the statute, this argument is moot insofar as it concerns retroactive application. *Supra* Section II(B).

Fourth, Defendant Hinch moves for summary judgment on the FDIC's claims relating to the partition of certain marital property of Paul and Mary Hinch as set forth in the Partition Agreement of February 14, 1986. As discussed above, the Court finds that factual disputes are involved in determining whether this 1986 agreement constituted a fraudulent transfer. These factual issues involve the intent of the parties in executing the partition agreement, the consideration paid by the parties, and the fair market value of the assets partitioned, thereby precluding the entry of summary judgment. *Supra* Section III(B).

Finally, the Court finds that material issues of fact exist with regard to the homestead designation of Defendant Paul Hinch. The Hinch family currently leases a home in Tulsa, Oklahoma where Mr. Hinch maintains his business and also has property in Texas. In light of issues of fact involving the actual and intended residence of Paul and Mary Hinch, the Court denies the Motion for Summary Judgment on this claim. *Supra* Section III(C).

**V.  *Conclusion***

In light of the considerations discussed above, the Court dismisses all causes of action that seek to apply 12 U.S.C. § 1821(d)(17)–(19) to transactions made before the effective date of the legislation. Furthermore, claims against the Defendants based on 12 O.S. § 850 should be dismissed. The Motion to Dismiss by Defendants and the Motions for Summary Judgment filed by

Defendants and by Defendant Hinch are denied in all other respects.