**RESOLUTION TRUST CORPORATION, Petitioner,**

v.

**Leopold H. GREIF, Ralph E. Lewis, and James W. Sight, Respondents.**

**Civ. A. No. 95–MC–251–EEO.**

United States District Court,
D. Kansas.

Oct. 27, 1995.

Taylor Fields, Fields, Brown, Williams & Clark, Kansas City, MO, Brenden W. Webb, Fields & Brown, Kansas City, MO, Suzanne Rigby, Resolution Trust Corporation, Washington, DC, for petitioner.

Ralph E. Lewis, pro se.

James W. Sight, pro se.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on the petition of the Resolution Trust Corporation (RTC) for Summary Enforcement of Administrative Subpoena Duces Tecum (Doc. # 1). Respondent Leopold H. Greif opposes enforcement of the subpoenas duces tecum. For the reasons set forth below, the RTC's petition for summary enforcement is held in abeyance pending further order of the court.

## I. *Background*

### A. Statutory Background

In response to the savings and loan crisis, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which created the RTC and granted it broad powers and duties. Congress conferred upon the RTC much of the authority afforded the Federal Deposit Insurance Corporation, including conservatorship and receivership powers. 12 U.S.C. § 1821(d). More specifically, Congress imposed on the RTC the duty to conduct its operations in a manner that maximizes the return on the disposition of the assets of failed insured depository institutions, makes efficient use of funds obtained from the government to carry out its functions, and minimizes the loss realized in the resolution of cases. 12 U.S.C. § 1441a(b)(3)(C). In its capacity as receiver, the RTC may, *inter alia,* avoid fraudulent asset transfers, 12 U.S.C. § 1821(d)(17), assert claims against the entities' directors and officers, 12 U.S.C. § 1821(k), collect money due the institution, 12 U.S.C. § 1821(d)(2)(B)(ii), and place the institution in liquidation, 12 U.S.C. § 1821(d)(2)(E).

To facilitate the RTC's pursuit of these broad objectives, Congress empowered the RTC to issue administrative subpoenas "for purposes of carrying out any power, authority, or duty" under the statute. 12 U.S.C. §§ 1818(n), 1821(d)(2)(I)(i). 12 U.S.C. § 1818(n) specifically gives the RTC "the power ... to issue, revoke, quash, or modify subpenas and subpenas duces tecum ..." and authorizes the RTC to apply to the courts for enforcement of such subpoenas. 12 U.S.C. § 1818(n) provides:

> Any such agency ... may apply to the United States District Court for the District of Columbia, or the United States district court for the judicial district ... in which such proceeding is being conducted, ... for enforcement of any subpena or subpena duces tecum issued pursuant to this subsection, and such courts shall have jurisdiction and power to order and require compliance therewith.

### B. Factual Background

On April 2, 1993, the RTC was appointed receiver and conservator of Pioneer Savings & Loan Association ("Pioneer"). On October 28, 1993, the RTC issued an Order of Investigation regarding Pioneer. The RTC order authorized the use of subpoenas in the investigation. The purposes of the investigation were to determine whether:

> (1) former directors, officers, and others who provided services to, or otherwise dealt with, Pioneer, its successors or affiliates may be liable as a result of any actions, or failures to act, in connection with or which may have affected Pioneer, its successors or affiliates; (2) the RTC should seek to avoid a transfer of any interests or an incurrence of any obligations; (3) the RTC should seek an attachment of assets; and (4) pursuit of such litigation would be cost-effective, considering the extent of the potential defendant's ability to pay a judgment in any such litigation.

Order of Investigation, p. 1.

Respondent Lee Greif was the chairman and a director of Pioneer from January 1986 until September 1992. Respondent Ralph Lewis was the president and a director from January 1986 until August 1989. Respondent James Sight was a director from May 1987 until December 1989. According to the declaration of John S. Torkelson, senior attorney in the legal division of the RTC, based on the investigation to date, including an analysis of Pioneer's loan files and other records, the RTC suspects that Greif, Lewis, and Sight may be liable to the RTC based on actions they took or failed to take as directors and officers of Pioneer. Specifically, Torkelson states:

> [I]t appears that the respondents may have failed to exercise reasonable care in their management and oversight of Pioneer's lending practices. Regulatory examinations of Pioneer have cited several areas of such ineffective management by the officers and directors, including but not limited to: (1) ineffective analysis of the adequacy of loss allowances; (2) failure to recognize in-substance foreclosures; (3) weakness in ongoing credit administration;

and (4) inadequate and incomplete Board of Directors' minutes and reports. In addition, the RTC investigation to date has identified numerous large loans that were approved by the Board of Directors despite serious underwriting weaknesses, lack of adequate financial and credit information or analysis on the borrowers, and lack of adequate appraisals. The institution lost tens of millions of dollars on these imprudent loans.

Torkelson Declaration, ¶ 5.

In furtherance of its investigation, the RTC issued subpoenas duces tecum on November 18, 1993, to Lewis and Sight, and on December 1, 1993, to Greif. The RTC issued additional subpoenas duces tecum to Greif, Lewis, and Sight on February 17, 1995. Following receipt of the subpoenas duces tecum, Greif, Lewis and Sight timely served objections and motions to quash on the RTC. The RTC ruled in favor of enforcing the subpoenas, and directed the respondents to make production within ten days of receipt of the RTC's ruling.

Respondents did not comply with the subpoenas duces tecum within the ten days provided by the RTC. The RTC then filed the instant petition for enforcement of the subpoenas duces tecum. By order dated October 13, 1995, the court ruled on the RTC's petition for enforcement as to respondents Lewis and Sight. The court held that the objections raised by Lewis and Sight were without merit, and directed them to comply with the subpoenas duces tecum within ten days of the date of the order. Now before the court is the RTC's petition to enforce the subpoenas duces tecum as to respondent Greif.

Greif represents to the court that he has complied with the requests in the December 1, 1993, subpoena duces tecum seeking business records of Pioneer and business records of any other business entity in his possession that he believed were responsive to the subpoena. In addition, Greif states that he has complied with the subpoena request for his federal income tax returns for the years 1990 through 1992.

In Greif's memorandum in opposition to enforcement of the subpoenas duces tecum, he joins in the arguments raised by respondents Lewis and Sight, and then asserts additional grounds for opposing enforcement of the subpoenas duces tecum.

The court will first consider the arguments raised by Lewis and Sight to which Greif joins, and then consider the additional arguments Greif raises.

## II. *Discussion*

### A. Greif's Fourth Amendment Privacy Interests

Greif objects to production of the documents sought in subpart III.B. of the December 1, 1993, subpoena on the grounds that such documents contain personal financial information. Greif contends that the RTC's request for personal financial information impinges on his constitutional rights of privacy and to be free from illegal searches and seizures. He maintains that "when the RTC seeks personal financial information, it is required to at least make some showing of wrongdoing." In support of this theory, Greif cites *Freese v. FDIC*, 837 F.Supp. 22 (D.N.H.1993); *RTC v. Feffer*, 793 F.Supp. 11 (D.D.C.1992); and *RTC v. Walde*, 18 F.3d 943 (D.C.Cir.1994). He asserts that the RTC's "true purpose" behind the request for financial information is to assess the net worth of respondents to determine if respondents are "worth suing."

The leading case regarding the Fourth Amendment limitations on subpoena power is *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). Courts have relied upon *Oklahoma Press* as establishing the standards which govern subpoenas issued by administrative agencies. In *Oklahoma Press*, the court framed the issue as one of "balancing the public interest against private security" and held that the "gist of the protection is in the requirement that the disclosure sought shall not be unreasonable." *Id.* at 208, 66 S.Ct. at 505. Elaborating on the reasonableness requirement, the Court set out three guidelines. First, no specific crime need be charged; "it is enough that the investigation be for a lawfully authorized purpose, within the power of Congress to command." *Id.* at

209, 66 S.Ct. at 505. Second, because no specific crime need be alleged, probable cause to suspect the commission of a crime is unnecessary. Instead, a subpoena is valid if "the documents sought are relevant to the inquiry." *Id.* Third, the subpoena must contain "a specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry." *Id.*

Greif does not appear to contest the first requirement, that the purpose of the investigation is authorized. Indeed, the Supreme Court has approved the broad investigatory powers of administrative agencies, equating agency powers with the powers of

> the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is a probable violation of the law.

*United States v. Morton Salt Co.,* 338 U.S. 632, 642–43, 70 S.Ct. 357, 364, 94 L.Ed. 401 (1950). In *Morton Salt Co.,* 338 U.S. at 652, 70 S.Ct. at 368, the Supreme Court articulated the now well-settled principle that an administrative agency is entitled to broad deference in investigating possible violations of law.

 The second standard of reasonableness set forth in *Oklahoma Press* is the requirement that the subpoenaed documents be relevant to the investigatory body's inquiry. Agencies are given considerable discretion in seeking information relevant to legitimate law enforcement investigations. *Dawar v. HUD,* 820 F.Supp. 545, 547 (D.Kan. 1993). The agency is not required to "make any factual showing that a law has been violated as a condition precedent to enforcement" of a subpoena. *Donovan v. Shaw,* 668 F.2d 985 (8th Cir.1982). Rather, an administrative subpoena "is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite, and the information is *reasonably relevant.*" *Morton Salt,* 338 U.S. at 652, 70 S.Ct. at 369 (emphasis added). Put differently, a district court

must enforce a federal agency's investigative subpoena if the information sought is " 'not plainly incompetent or irrelevant to any lawful purpose' of the [agency]." *FTC v. Texaco, Inc.,* 555 F.2d 862, 872 (D.C.Cir.1977) (*en banc* ), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 2940, 53 L.Ed.2d 1072 (1977) (quoting *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943)).

 The standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one. *FTC v. Invention Submission Corp.,* 965 F.2d 1086, 1089 (1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993). At the investigatory stage, the agency does not seek information necessary to prove specific charges; it merely must have a suspicion that the law is being or was violated in some way and wants to determine whether or not to file a complaint. *See Texaco,* 555 F.2d at 872. "The requested material, therefore, need only be relevant to the investigation— the boundary of which may be defined quite generally." *Invention Submission,* 965 F.2d at 1090. Thus, relevancy is measured against the "general purposes of [the agency's] investigation." *Texaco,* 555 F.2d at 874.

 Furthermore, the agency

> has no obligation to establish precisely the relevance of the material it seeks in an investigative subpoena by tying that material to a particular theory of violation . . . [I]n light of the broad deference we afford the investigating agency, it is essentially the respondent's burden to show that the information is irrelevant.

*Id.* (citation omitted). Courts have held that the agency's own appraisal of relevance must be accepted so long as it is not " 'obviously wrong.' " *FTC v. Carter,* 636 F.2d 781, 787–88 (D.C.Cir.1980) (quoting *Texaco,* 555 F.2d at 877 n. 32).

 The third element of the reasonableness requirement "comes down to [whether] specification of the documents to be produced [is] adequate, but not excessive, for the purposes of the relevant inquiry." *Oklahoma Press* 327 U.S. at 209, 66 S.Ct. at 506. This requirement has two prongs.

First, the subpoena must contain a sufficiently definite description of the documents so that a person can in good faith understand which documents must be produced.[1] Courts generally do not require greater specificity than is within the knowledge of the investigative body. As with the relevance requirement, the burden of establishing that a subpoena inadequately specifies documents is on the party challenging the subpoena. *See In re Grand Jury Subpoenas Addressed to Certain Executive Officers of the M.G. Allen & Assocs., Inc.*, 391 F.Supp. 991 (D.R.I.1975). Second, the subpoena must not be so broad that compliance with its terms is unduly burdensome. *In re Corrado Bros.*, 367 F.Supp. 1126 (D.Del.1973).

■■■■■■ These determinations "cannot be reduced to a formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry." *Oklahoma Press*, 327 U.S. at 209, 66 S.Ct. at 506. Moreover, in determining whether the RTC acted reasonably in issuing a subpoena, the court "must give 'due weight ... to the specific reasonable inferences' that the RTC might draw from the information available to it in light of its experience investigating other failed institutions." *RTC v. Walde*, 18 F.3d 943 (D.C.Cir.1994) (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)).

The court has carefully reviewed the description of the documents sought by the RTC in subpart III.B. of the December 1, 1993, subpoena served on Greif. Ever mindful of the deferential standard by which a court must review relevancy of the material sought in an administrative subpoena issued by the RTC, we find that such documents are reasonably relevant to the issues of liability, the avoidance of asset transfers, or the attachment of assets.

### 1. Determining Liability

■■■■■■ With regard to the issue of liability, the court finds, as the court did in *Walde*,

18 F.3d 943, 947 (D.C.Cir.1994), that the respondents' financial statements and bank statements are relevant; such documents might reveal secret payments from individuals whose loans Greif had approved. By the same reasoning, the other requested documents enumerated in B.III. (*i.e.*, documents indicating respondents' income, assets, and net worth, tax returns, investment records, and trust documents) are relevant inasmuch as they may reveal financial relationships between Greif as director or chairman of Pioneer, and borrowers or others having dealings with the savings association. *See, e.g., OTS v. Zannis*, Misc. No. 90–0136, 1990 WL 421186, at *2, 1990 U.S. Dist. LEXIS 10591, at *5 (D.D.C. Aug. 14, 1990) (even "seemingly innocuous" entries in former director's personal financial records may be relevant to liability investigation); *RTC v. Frates*, 860 F.Supp. 5, 5–6 (D.D.C.1994), *aff'd*, 61 F.3d 962 (1995) (court enforced RTC subpoena that was virtually identical to subpart III.B.1–5 on grounds that each category of information was reasonably relevant to the issues of liability, avoidance of asset transfers, or attachment of assets); *RTC v. Burke*, 869 F.Supp. 15, 19 (D.D.C.1994) (current financial information as well as the last three years of tax returns were reasonably relevant to issue of respondents' liability, avoidance of asset transfers, or judicial attachment of current assets).

### 2. Avoidable Asset Transfers and Attachable Assets

■■■■■■ The RTC has statutory authority to avoid certain asset transfers by former officers or directors of failed financial institutions, and to seek asset freezes. 12 U.S.C. §§ 1821(d)(17) and (d)(18). With respect to the identification of any avoidable asset transfers or attachable assets, the investigating agency is afforded "broad deference." *Walde*, 18 F.3d at 948. "A sufficient suspicion of ... the need for attachment of assets" may be founded "simply on the basis of Respondents' status as former directors of

---

**1.** "This need not be with such particularity as to enable the witness to pick out a certain piece of paper and say, 'Here it is.' However, the request must be sufficiently definite to provide guidance as to what is to be produced by standards or criteria that make clear the duty of the person subpoenaed." *In re Grand Jury Proceedings*, 601 F.2d 162 (5th Cir.1979).

the failed savings institution." *RTC v. Koch,* Misc. No. 93–003, 1993 WL 177736 (D.D.C. Feb. 17, 1993).

 We find that Greif's personal financial information, requested in the December 1993 subpoena duces tecum, is relevant to the RTC's authority to investigate whether Greif may have transferred assets in an attempt to put any assets beyond the RTC's or Pioneer's reach. Moreover, we find that Greif's personal financial information, requested in the subpoena duces tecum, may be relevant as to the RTC's decision whether to seek an attachment of assets. Real estate or other property transfers such as those sought in III.B.5. are relevant to these ends as well. Similarly, financial statements and tax returns from 1990 to 1992 may reveal substantial changes in Greif's assets, thus indicating a need for further investigation regarding asset transfers and a possible asset freeze.

In sum, we conclude that the information requested in the RTC's December 1993 subpoena duces tecum is not irrelevant to liability, to the avoidance of asset transfers, and/or to the attachment of assets. Greif has simply not met his burden to prove otherwise.

The three cases relied upon by Greif, *Freese v. FDIC,* 837 F.Supp. 22 (D.N.H. 1993); *RTC v. Feffer,* 793 F.Supp. 11 (D.D.C. 1992); and *RTC v. Walde,* 18 F.3d 943 (D.C.Cir.1994), when carefully examined, are not helpful to him. Neither *Freese* nor *Feffer* are controlling authority, and *Walde* actually supports the position of the RTC.

In the *Freese* opinion, relied upon by Greif, the district court denied enforcement of certain administrative subpoenas duces tecum which sought to compel former officers and directors of a failed bank to turn over personal financial records to the FDIC. That decision, however, was appealed to the First Circuit, which initially entered an order reversing the district court's decision, and ordered enforcement of the subpoenas "in accordance with the D.C. Circuit's decision in *Resolution Trust v. Walde,* 18 F.3d 943 (D.C.Cir.1994)." Shortly after the First Circuit entered its order reversing the district court, the FDIC advised the court that the agency had decided not to sue the targets of the administrative subpoena, and asked that the lower court's decision be vacated. The court, reasoning that the case had become moot, dismissed the appeal and vacated the lower court's decision. Thus, the *Freese* opinion upon which Greif relies is not persuasive.

Greif's reliance on *Feffer* is likewise misplaced. After *Feffer* was decided, the Court of Appeals for the District of Columbia issued its opinion in *RTC v. Walde. Feffer* pre-dated the controlling precedent in *Walde,* and thus we find *Feffer* unpersuasive authority. To the extent that the holding in *Feffer* is inconsistent with *Walde* and its progeny, we view *Feffer* as implicitly overruled by *Walde.*

In *Walde,* the District of Columbia Circuit held that the RTC has authority to subpoena private financial information to the extent it is reasonably relevant to the potential liability of officers and directors of a failed financial institution. *Id.* at 947 ("We find that some of the personal financial information sought under the subpoenas is reasonably relevant to the potential liability of officers and directors. Bank statements of officers and directors, for example, might reveal secret payments from individuals whose loans they had approved.").

Moreover, the court in *Walde* expressly rejected the notion that a showing of wrongdoing was required before the RTC could subpoena documents relevant to attachment of assets or avoidance of asset transfers. *Walde* reasoned:

> To require the RTC to make such a preliminary determination of liability before subpoenaing documents that might reveal, for example, the fraudulent transfer of S & L assets would seriously hamper the agency's ability to locate and save a failed institution's assets.

*Id.* at 947.

Finally, *Walde* held that in circumstances where an RTC subpoena requests personal financial information from a former officer or director "for the *sole* purpose of determining whether that individual has a sufficient net worth to warrant suing," 18 F.3d at 948

(emphasis added), the RTC must have an "articulable suspicion that a former officer or director is liable to the failed institution before a subpoena for his personal financial information may issue." *Id.* at 949. No such showing is required, however, when the subpoenaed information is · related not just to assessing the cost-effectiveness of litigation, but is also relevant to liability issues or to transfer or attachment of assets. *See, e.g., RTC v. Frates,* 61 F.3d 962, 964 (D.C.Cir. 1995) (court stated that respondent's argument that *Walde* requires the RTC to demonstrate an articulable suspicion of liability before it may subpoena an individual's personal financial information for the purposes of assessing liability, avoidance of asset transfers, or attachment of assets rested on a misunderstanding of *Walde; Walde* held that the RTC must demonstrate an articulable suspicion only where it subpoenas personal financial information for the sole purpose of determining the subpoenaed person's net worth). *See also In re Sealed Case,* 42 F.3d 1412, 1416 (D.C.Cir.1994) ("In *Walde,* we required the agency to demonstrate an 'articulable suspicion' of liability before we would enforce a subpoena for personal financial information to further the agency's stated purpose of determining cost-effectiveness. *See* 18 F.3d at 949. We did not, however, require any similar finding when the RTC sought the same information to determine liability or prevent asset transfers. *See id.* at 947 ..."); *RTC v. Barton,* 1994 WL 725327 (D.D.C. Oct. 17, 1994) (court found that because information sought by RTC was not pursued solely for the purpose of determining the cost-effectiveness of litigation, it was unnecessary for the court to determine whether the RTC had demonstrated an "articulable suspicion" of liability); *RTC v. Adams,* 869 F.Supp. 1 (D.D.C.1994) (showing of articulable suspicion of respondents' liability only required where the RTC subpoenas personal financial information for the sole purpose of assessing the cost-effectiveness of litigation); *RTC v. Burke,* 869 F.Supp. 15

(D.D.C.1994) (RTC must have "articulable suspicion" that a former officer or director is liable to a failed financial institution before a subpoena for his or her personal financial information may issue for the purpose of assessing the subpoenaed person's net worth.).

■■■ The District of Columbia Circuit appears to have recently considered and rejected imposing a general requirement on an agency to make a preliminary showing of wrongdoing before a court may enforce a subpoena duces tecum. In *In re Sealed Case,* 42 F.3d 1412, 1416–17 (D.C.Cir.1994) the court stated:

> [A]ppellants contend that the OTS should be required to make a ·preliminary determination of liability before the court enforces a subpoena for personal financial information in order to protect their Fourth Amendment privacy interests.
>
> . . . .
>
> We reject, however, appellants' argument that we should go beyond *Walde* and require the OTS to make a preliminary determination of liability before it enforces the subpoenas in order to protect their privacy interests in personal financial documents. The constitutional concerns that arise here, which are identical to those in *Walde,* are satisfied by the application of the "articulable suspicion" standard.... This heightened standard sufficiently protects an individual from unwarranted invasions into personal financial documents when the agency's investigation is aimed at determining an individual's wealth. We find no further requirement in the Constitution.

Because we have determined that the purpose of the RTC's investigation is not solely to assess the respondents' net worth, no preliminary determination of liability or finding of "articulable suspicion" is required under the Constitution.[2]

---

**2.** The court is aware that in a recent opinion, *Parks v. FDIC,* No. 94–2262, 1995 WL 529629 (1st Cir. September 13, 1995), the First Circuit refused to enforce a subpoena on Fourth Amendment grounds, and held that the FDIC was required to articulate some individualized suspi-

cion of wrongdoing before it was entitled to subpoena private papers. We decline to adopt the reasoning in *Parks,* however, and choose to follow the well-established precedent of the District of Columbia Circuit. *See* supra, pp. 1466–67.

We hold that because we find the personal financial information requested in subpart B.III. of the 1993 subpoena is relevant to three of the four lawful purposes listed in the RTC's order of investigation, and thus not sought solely for the purpose of assessing respondents' net worth, we need not determine whether the RTC has shown an articulable suspicion of Greif's liability. *See RTC v. Walde*, 18 F.3d 943, 948–49 (D.C.Cir.1994).

▇▇▇ Next, Greif intimates that the financial information sought is not relevant to the RTC's purpose of investigating liability because some of the information requested post-dates Greif's tenure on the Pioneer Board of Directors. The court is not persuaded by this argument. Other courts that have addressed this issue have held that even if the subpoenaed financial information post-dates the respondent's affiliation with the financial institution, such information can be relevant to an investigation of the respondent's potential liability. *See, e.g., Frates*, 860 F.Supp. at 6, n. 1 (district court upheld enforcement of subpoena seeking personal financial information of former officer or director of failed financial institution, where subpoena requested information post-dating respondent's tenure at financial institution); *Burke*, 869 F.Supp. at 19 ("Although the financial information requested post-dates the Respondents' tenure at Home Savings, the court finds that it could reflect business associations, investments, or other financial arrangements between borrowers or others who had dealings with Home Savings and the Respondents during or after the Respondents' terms of employment at Home Savings."). *See also Dawar v. HUD*, 820 F.Supp. 545, 547 (D.Kan.1993) (subpoenas requesting information for time periods before and after subpoena recipient was involved with the HUD project under investigation were not overbroad; the time period covered by the subpoenas was reasonably relevant to the agency's legitimate investigation of possible misappropriations of project funds).

▇▇▇ Greif also urges the court to deny enforcement of the subpoenas on the grounds that the potential claims under investigation are barred by the applicable statute of limitations. The law, however, is clear that "a party may not defeat an agency's authority to investigate by raising what could be a defense if the agency subsequently decides to bring an action against the party." *EEOC v. American Express Centurion Bank*, 758 F.Supp. 217, 222 (D.Del.1991). *See also EEOC v. Delaware State Police*, 618 F.Supp. 451, 453 (D.Del.1985) (refusing to determine merits of statute of limitations defense that could be raised in response to hypothetical future complaint).

Requiring the court to consider Greif's potential defenses or underlying liability is contrary to summary enforcement jurisprudence. *See, e.g., Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corporation*, 5 F.3d 1508, 1512–13 (D.C.Cir.1993) (the court's "role is limited to evaluating whether the subpoena is for a lawful purpose, whether the documents requested are relevant to that purpose, and whether the demand is reasonable"); *Texaco*, 555 F.2d at 880 (district court must not "preview the ultimate complaint"). Thus, Greif's argument addressing his potential statute of limitations defense to any lawsuit the RTC might bring against him is irrelevant to the enforceability of the RTC's administrative subpoenas.

Finally, in the surreply memorandum, Greif asserts the following additional argument: To the extent the RTC seeks documents for the purpose of avoiding transfers or freezing assets, the subpoenas should not be enforced because the RTC seeks documents dating prior to May 28, 1991, the effective date of the statutory mandate granting the RTC authority to avoid transfers and attach assets, section 1821(d)(17)–(19), and thus the request is "overbroad as to time." Greif offers no explanation for adding these grounds to a surreply, which should instead serve to rebut matters raised by the reply of the opposing party. The court will nevertheless address this argument.

Greif relies on *FDIC v. Hinch*, 879 F.Supp. 1099 (N.D.Okla.1995). Greif's reliance on this case is misplaced. In *Hinch*, the court held that the FDIC, in its capacity as receiver, was *not entitled to bring an action* under section 1821(d)(17)–(19) against certain debtors of a failed bank. The court reasoned

that the legislation did not become effective until May 28, 1991; all the allegations in the case involved acts taken before that date; and the statute did not apply retroactively to acts occurring before the effective date of the legislation. *Id.* at 1102–04.

■■ Here, the RTC is simply seeking information pursuant to an investigatory subpoena, whereas in *Hinch,* the issue was the propriety of bringing an action against the respondents. Even if we were to conclude that the determination in *Hinch* regarding the retroactivity of 12 U.S.C. § 1821(d)(17)–(19) was properly reasoned, such an argument is one more appropriately brought in a motion to dismiss (as in *Hinch* ), if and when the RTC chooses to file a complaint. Once again, "a party may not defeat an agency's authority to investigate by raising what could be a defense if the agency subsequently decides to bring an action against the party." *American Express,* 758 F.Supp. at 222. In short, Greif has failed to establish that the subpoenas are overbroad simply because they seek information pre-dating the effective date of a statute which may or may not form the basis for subsequent actions by the RTC.

We conclude that the foregoing objections raised by Greif to the enforcement of the subpoenas duces tecum served upon him are without merit.

### B. Greif's Fifth Amendment Privilege

Greif next objects to the production of the documents requested in the December 1, 1993, subpoena duces tecum and the February 17, 1995, subpoena duces tecum on the grounds that production of the documents would violate his Fifth Amendment privilege against self-incrimination.

■■ The court finds, under the facts and circumstances of this case, that Greif's invocation of the Fifth Amendment is on its face legitimate inasmuch as the documents requested may be personal documents, and the mere act of producing those documents may provide a "link in the chain of evidence"

needed to prosecute Greif for a crime. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). The court suggests the following resolution: [3]

It appears to the court that an actual inspection of all documents claimed to be protected by the Fifth Amendment must occur. We find the decision of the District of Columbia Circuit in *In re Sealed Case,* 950 F.2d 736 (D.C.Cir.1991), instructive. There, a former federal official asserted the Fifth Amendment right to protection against self-incrimination with respect to production of certain documents pursuant to a grand jury subpoena duces tecum. The district court held that the former official was entitled to withhold certain categories of documents on the ground that they were "personal records" sheltered from production by the Fifth Amendment. In so ruling, the district court did not examine the documents that the former official claimed were "personal records." The party seeking enforcement of the subpoena duces tecum appealed, and challenged the portions of the district court order that permitted the recipient of the subpoena to withhold certain categories of documents.

The District of Columbia Circuit vacated the challenged portions of the district court's order, and remanded the matter for further consideration as to whether any of the documents at issue fell within the personal records category so as to be protected from compulsory disclosure under the Fifth Amendment. The court stated:

The district court's ruling relied upon appellee's ex parte submission, which described fourteen categories of documents but did not include the documents themselves. The court accepted these categorical descriptions as adequately informative and did not direct production of any of the documents in categories A, B, L–1, and M, or any in categories C–K that appellee may have decided were not official records. . . .

A reviewing court, in these circumstances, is unable to determine whether the trial court's ruling is reasonable, i.e., supported by the record and not arbitrary. The district court, as just observed, en-

---

**3.** The court would propose that the parties stipulate, in writing, that they agree to proceed in this manner and with the conditions referenced in

the court's suggestions. The parties are free to suggest to the court alternative resolutions to this problem.

**1470**

gaged in no factfinding from the documents themselves; the court neither saw the documents nor heard testimony, in open court or in camera, regarding the nature and use of the undisclosed documents. Because the district court accepted a blindfold, it was unable to set down reasons, capable of review, for designating certain documents as government records and others as personal papers. *See, e.g., Grand Jury Subpoena Duces Tecum Dated April 23, 1981 Witness v. United States,* 657 F.2d 5, 7–8 (2d Cir.1981).

... At the very least, in a case such as the one before us, the district court should not rest on counsel's categorical groupings; the court should see the documents as to which the characterization "government record" or "private record" is genuinely in contention, and say why particular documents qualify as government records not subject to the Fifth Amendment, or instead, as personal records for which the privilege may be invoked. *See United States v. Wujkowski,* 929 F.2d 981, 984 (4th Cir.1991) (court should not "simply presume" that certain categories of documents, e.g., "appointment books, day planners, and pocket calendars," are "intrinsically either corporate or personal in nature").

... We see no way other than actual inspection, however, for the trial court reliably to determine the nature of particular documents, and to provide a record and reasoned decision for appellate review. If documents are so sensitive that the district court cannot publish reasons for the court's disposition without revealing information legitimately kept confidential, the court can seal the decision, thus preserving it for the court of appeals' consideration.

*Id.* at 738–39.

■ Thus, if the parties so stipulate, the court would order Greif to produce and file under seal with the court, within twenty (20) days, the documents he claims are protected by the Fifth Amendment, along with a written inventory of said documents. In the inventory, Greif would be ordered to specifically number each document, and then for each document describe:

(1) the nature of the document; (2) the purpose of the document; (3) the use or uses of the document; (4) who maintained possession and who had access to the document; (5) whether Pioneer or another corporation required the preparation of the document; (6) whether the document's existence was necessary to the conduct of Pioneer; (7) why the document or production of the document should be afforded Fifth Amendment protection; (8) why the whole document and not just portions of the document are privileged; and (9) why the document could not be excised with respect to any privileged portions. Additionally, Greif is ordered to Bates stamp or otherwise number each page of every document, to assist the court and the parties in referencing the pages within the documents.

In addition, the RTC must stipulate that Greif's act of producing, and production of, the documents does not waive any Fifth Amendment privilege or any other protected rights that Greif may have.

The court would then perform an independent examination of each page of each document Greif claims is privileged. After such examination, the court would issue a written order, under seal, identifying only by document number and page number which documents or portions of documents are privileged.